William BREWER, Plaintiff–Appellant,

v.

RAYNOR MANUFACTURING CO., d/b/a Raynor Overhead Doors, Inc., Defendant–Respondent.

No. 23083.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 9, 2000.

Joseph A. Frank, David T. Dolan, Frank, Dolan & Mueller, L.L.C., St. Louis, for appellant.

Christopher P. Leritz, Leritz, Plunkert & Bruning, P.C., St. Louis, for respondent.

JOHN E. PARRISH, Judge.

This is an appeal of a defendant's judgment in a products liability case.[1] William Brewer (plaintiff) raises two points on appeal. Both are directed to evidentiary issues. Plaintiff contends the trial court erred in permitting evidence to be introduced concerning lack of prior occurrences similar to the one that produced the injuries that are the basis of plaintiff's action and in allowing certain expert witness testimony by Scott Jackson concerning installation errors plaintiff committed. This court affirms.

In 1994 plaintiff was building a garage behind his house for storage. It was a "pole barn" type building. Plaintiff explained, "They're just six-by-six posts set in the ground, and it's framed in regular two-by-four lumber and coated with sheet metal." He purchased a garage door manufactured by Raynor Manufacturing Co. (Raynor) for installation in the garage. He did part of the work necessary to install the garage door the weekend of July 3, 1994. He continued the project the following weekend.

Plaintiff installed the necessary hardware and checked to make sure "everything was tight." He placed a wrench on a 5/16–inch lag screw in a bracket that supported a torsion spring assembly on the door. The screw failed, causing the torsion spring to release. The bracket struck

1. The petition in this case named two defendants, Raynor Manufacturing Co., d/b/a Raynor Overhead Doors, Inc., and Mike Miller, d/b/a Miller Door Company. The petition was dismissed as to Miller prior to trial.

plaintiff, knocking him off a ladder and injuring his arm and hands.

Plaintiff claimed that the torsion spring mounting assembly on the garage door was defective and unreasonably dangerous when put to a reasonably anticipated use; that it was used in a reasonably anticipated manner; that the injuries he sustained were a direct result of the defective condition that existed at the time the assembly was sold. Raynor asserted that when plaintiff used the tension mounting system, he knew of the danger it presented; that he voluntarily and unreasonably exposed himself to that danger. Raynor argued that plaintiff's conduct caused or contributed to any injury he sustained.

At trial Raynor presented deposition testimony of its employees, Richard Smith and Randall Renne.[2] Mr. Smith, Raynor's director of manufacturing, testified that Raynor had made the same door that plaintiff purchased since the 1960s. Raynor manufactures more than 10,000 doors a year. Mr. Smith was asked, "In your experience with hanging doors, have you ever seen the screws on a mounting bracket break off." Mr. Smith answered, "No." He was then asked, "Are you aware of that happening other than what Mr. Brewer alleges happened in this lawsuit with regards to any other Raynor doors?" He answered, "No." There was no objection to that testimony.

Randall Renne is Raynor's director of sales and marketing. Mr. Renne has been employed by Raynor for 20 years. He has been director of sales and marketing "[f]or about five years." He testified that plaintiff's case was the only one he remembered involving screw failure in a door manufac-

tured by Raynor. There was no objection to Mr. Renne's deposition testimony.

The lack of incidents in which screws had failed on Raynor's doors was also addressed during cross-examination of plaintiff's expert witness, H. Boulter Kelsey, Jr. Mr. Kelsey is a mechanical engineer in a forensic practice with the St. Louis firm of Senne, Kelsey & Associates.

Raynor's attorney asked Mr. Kelsey if he had knowledge of any similar circumstances to those in this case. There was no objection to the question. Mr. Kelsey testified that he was "not aware of any other specific screw head failures" that led to the type of injury sustained by plaintiff.

Plaintiff's first allegation of error is that the trial court erred in allowing Raynor to present evidence regarding the lack of prior occurrences of screw failure in torsion spring assemblies on garage doors it manufactured. Plaintiff argues no proper foundation was established for admission of that evidence.

Raynor correctly points out, however, that plaintiff failed to preserve the issue he attempts to present in Point I. Plaintiff did not object at trial to the questions posed concerning past occurrences of screw failure in torsion spring assemblies manufactured by Raynor. "To preserve evidentiary questions for appeal, there must be an objection giving the grounds at the time the evidence is sought to be introduced, and the same objection must be set out in the motion for new trial and then carried forward in the appeal brief." *Rogers v. B.G. Transit Corp.*, 949 S.W.2d 151, 153 (Mo.App.1997).[3] This court has considered plaintiff's complaint for plain error

2. The depositions were not filed with this court. The trial transcript recites deposition testimony that was read into the trial record.

3. Raynor's brief states plaintiff "submitted and argued" a motion in limine directed to admissibility of evidence on this subject. Although the transcript includes argument directed to "a motion in limine to preclude [Raynor] from presenting any evidence of the

absence of prior accidents," the legal file contains no copy of such a motion. Regardless, even when a motion in limine is filed and ruled on, the issue to which it is directed is not preserved for appellate review absent an objection at trial at the time the challenged evidence is presented. *Lewis v. FAG Bearings Corp.*, 5 S.W.3d 579, 587 (Mo.App.1999).

as permitted by Rule 84.13(c) and finds none. Point I is denied.

Plaintiff's second point is directed to testimony of Scott Jackson, an expert witness who testified on behalf of Raynor. Plaintiff contends the trial court erred in allowing Mr. Jackson to testify concerning errors plaintiff committed in installing the garage door that were unrelated to the screw failure that caused his injury. He contends the testimony was irrelevant.

During plaintiff's direct testimony during his case in chief, he was asked about jobs he had held. At the time of trial he was employed by Vernaci Construction. He testified that Vernaci was "involved in mostly highway development." He explained that when he began working for Vernaci, the company had a maintenance agreement with Wal–Mart stores; that he traveled throughout the Midwest "perform[ing] maintenance things for Wal–Mart, things that that [sic] they needed fixed at their stores. From parking lot to the structure, whatever they needed."

Plaintiff was asked about the types of work he had done since high school. He testified that he spent three years in the Navy. He had been a hull technician. The group he worked with "was in charge of damaged control situations on ships and things like damage repair, welding, just basic repairs and things like that."

After his Navy service, plaintiff worked at a joist plant in Washington. He welded bar joists. He explained this involved "joists for building buildings, the roof sections of them." After leaving the job at the joist plant, plaintiff worked for a small contractor building houses. He was asked, "For the most part, since you got out of the Navy have you worked in the construction industry in one form or another?" Plaintiff answered, "In one form or another, pretty much." Plaintiff was asked if he

would say he was good at building things. He answered, "Yeah."

Plaintiff was then asked about building the garage where the garage door that produced his injury was installed. He explained how it was constructed and how long he had worked on it. He told about installing the garage door and the accident. Plaintiff's attorney asked, "Prior to putting this door up—on your garage here, had you ever put up a garage door before?" Plaintiff answered, "Yes, sir." He testified he had put up "[a]round six doors."

On cross-examination plaintiff was asked about various warnings that came with the door assembly he purchased and installed.[4] He acknowledged that warnings came with the door assembly. Plaintiff testified that the warnings included one indicating that removal of springs, cables, fasteners, brackets, or structural supports could result in severe injury or death. He knew the torsion spring was under extreme tension; that it could cause injury. He understood that before he installed the door. Plaintiff was asked if he was a qualified door mechanic. He answered, "I would consider myself qualified to hang a garage door, yes, sir." Upon further questioning, plaintiff acknowledged what he meant by that was that he thought he knew how to install a garage door.

Plaintiff was asked about the instructions and warnings that came with the door he purchased. He was asked the following questions and gave the following answers:

Q. ... And when it says, Adjustments [sic] and repairs should only be made by a qualified door mechanic, using the proper tools and instructions, you thought that that meant you, that you were a qualified door mechanic, correct? I guess. Is that right?

A. Sure.

---

4. No trial exhibits that were admitted in evidence were filed with this court. The transcript indicates various warning stickers or "blowups" of warning stickers were received in evidence. All this court has before it concerning those exhibits is references to them that appear in witnesses' statements recorded in the trial transcript.

Q. Okay. Have you ever receive [sic] any training from a garage door company or garage door installer?

A. No, sir.

Q. Okay. So, in fact, there could have been some—there could have been some parts to the installation of the door, or some things that you weren't aware of because you never received any training or any schooling on how to hang a door; is that correct?

A. Unless it—I read the instructions. I figured if read [sic] the instructions, that that would—that that would cover hanging the door.

Raynor called Scott Jackson as a witness. Mr. Jackson owns a company that sells and installs garage doors. He has installed garage doors for approximately 20 years, including Raynor doors. He testified about errors he observed in the procedure plaintiff followed in installing the garage door that produced his injury. Mr. Jackson's testimony included observations not related to the screw failure that was the direct cause of the injury. Plaintiff objected at trial on various grounds, including that such testimony was irrelevant. The trial court overruled the objection. Plaintiff included his claim that this was error in his motion for new trial.

Plaintiff contends the testimony of Mr. Jackson about his observations of the procedure plaintiff followed in installing the garage door, other than those related to the screw failure that produced plaintiff's injury, were collateral matters contradictory of testimony elicited from plaintiff by Raynor on cross-examination. He argues, for that reason, the testimony of Mr. Jackson, other than that related to the installation of the screws that failed, was irrelevant; that Raynor was bound by the answers it elicited from plaintiff on his cross-examination regarding his qualifications to install the garage door; that the

trial court committed error in overruling his objection to that testimony.

■■■ "The test as to whether a matter is collateral, as set forth in *Frechin v. Thornton*, 326 S.W.2d 122, 126 (Mo.1959), is whether the party seeking to introduce it for purposes of contradiction would be entitled to prove it as a part of his case." *D.K.L. by K.L. v. H.P.M.*, 763 S.W.2d 212, 218 (Mo.App.1988). "The general rule is that an opposing party is bound by a witness' answers elicited on cross-examination with respect to collateral matters and will not be permitted to introduce extrinsic evidence to refute the answers." *Cline v. William H. Friedman & Assoc., Inc.*, 882 S.W.2d 754, 760 (Mo.App.1994). An exception to this rule exists, however, when those matters were brought out on direct examination. *Maugh v. Chrysler Corp.*, 818 S.W.2d 658, 661 (Mo.App.1991).

An affirmative defense in this case was that when plaintiff was installing the garage door, he knew and appreciated the danger of the tension spring mounting system and voluntarily exposed himself to that danger; that this action caused or directly contributed to cause the injury he sustained. *See* § 537.765.2 and .3(3), RSMo 1994. That defense was submitted to the jury by Instruction No. 7 patterned after MAI 32.23 [1978 Revision].[5] Arguably, the matter was not collateral and Raynor was entitled to introduce evidence concerning whether plaintiff assumed the risk inherent to installing the garage door by failing to follow the instructions and warnings that came with the door.

■ Regardless, the issue of plaintiff's qualifications to install the garage door was the subject of testimony during the direct examination of plaintiff. Numerous questions were asked about his work experience that involved construction, including his experience in installing at least six

5. This case was not submitted as a comparative fault case. Neither the verdict-directing instruction, Instruction No. 6, nor Raynor's affirmative defense instruction, Instruction

No. 7, included the initial phrases set forth in MAI 37.01 [1986 New] or MAI 37.02 [1986 New], respectively.

garage doors. Raynor was entitled to cross-examine plaintiff on the subject without being bound by his answers. Because plaintiff's testimony on direct examination included the subject of his experience in installing garage doors, Raynor was entitled to present contradictory evidence concerning his qualifications to install the door. *Maugh, supra.* Point II is denied. The judgment is affirmed.

CROW, P.J., and SHRUM, J., concur.