Michael Shane WORTHINGTON,
Appellant,

v.

STATE of Missouri, Respondent.

No. SC 85783.

Supreme Court of Missouri,
En Banc.

May 31, 2005.

Rehearing Denied Aug. 2, 2005.

William J. Swift, Office of the Public Defender, Columbia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Adriane D. Crouse, Assistant Atty. Gen., Jefferson City, MO, for Respondent.

STITH, Judge.

Michael Shane Worthington pled guilty to the first-degree murder of Melinda Griffin. Mr. Worthington then chose to try the penalty phase of his trial to the judge rather than to a jury. The judge imposed the death penalty. This Court affirmed his conviction and death sentence, and his related convictions for first-degree burglary and forcible rape, in *State v. Worthington*, 8 S.W.3d 83 (Mo. banc 1999). Mr. Worthington then sought post-conviction relief, which was denied. Mr. Worthington now appeals that ruling, arguing that

1. *Worthington*, 8 S.W.3d at 86–87.

the motion court should have found that trial counsel was ineffective in numerous respects, including unreasonable trial strategy in failing to sufficiently investigate and present evidence about certain aspects of his social history, failing to object to certain evidence, failing to object to the trial judge's refusal to recuse herself and failure to call certain witnesses. He further alleges that the sentencing and post-conviction judges were not impartial and that the State does not have the ability to perform constitutional executions. This Court has exclusive jurisdiction because the death penalty was imposed. Mo. Const. art. V, sec. 10; Order of June 16, 1988. For the reasons set out below, this Court finds that the motion court did not err in denying post-conviction relief. Affirmed.

## I. BACKGROUND FACTS

On direct appeal, this Court found the following facts:[1]

"On September 29, 1995, appellant, Worthington, and a friend from work, Jill Morehead, were at his condominium in Lake St. Louis, watching television. At about 4:00 p.m., they left to pick up their paychecks from their employer, a local supermarket. They returned to the condo and had dinner and drinks. They then went to a nightclub where each had three drinks. After about two hours, Worthington and Morehead drove to Jennings where Worthington told Morehead he had to pick up money owed to him by a friend. Worthington later testified that he actually went to pick up drugs. Morehead stayed in her vehicle, while Worthington was in the house for about 15 minutes. They drove back to his condo where he left Morehead. Morehead left the condo when

Worthington did not return after about 45 minutes.

"Later that night, Worthington saw that the kitchen window was open in the condominium of his neighbor, Melinda Griffin. Worthington had seen Ms. Griffin around the condominium complex. He got a razor blade and gloves, and when he returned to her condo, he saw that a bathroom light had been turned on. Worthington cut through the screen. He confronted Ms. Griffin in the bedroom. He covered her mouth to stop her screams and strangled her until she became unconscious. Worthington began to rape her and she regained consciousness. Worthington raped Ms. Griffin with such force that he bruised the inside of her vagina, tore both labia minora, and made a large, deep tear between her vagina and anus. Ms. Griffin fought Worthington, and he beat her and strangled her to death. The wounds on her neck showed that Worthington used a rope or cord in addition to his hands to strangle her. He stole her jewelry, credit cards, mobile phone, keys, and her car.

"The next morning, September 30, 1995, a police officer pulled Worthington over, driving Ms. Griffin's car. The officer noticed a woman's items in the car such as make-up and shoes, but the car had not been reported stolen.

"The next day, October 1, a neighbor discovered Ms. Griffin's body. When police arrived, they found the screen in the kitchen window had been cut to gain entry. They found Ms. Griffin's body lying bruised, bloody, and naked at the foot of the bed, with a lace stocking draped across it. All the bedroom drawers had been pulled open. DNA testing later established that semen found on Ms. Griffin's body came from Worthington.

"Police officers found Worthington that evening, but when he saw the police he pulled out a knife, held it to his throat, and threatened to commit suicide. Police officers convinced him to put the knife down and brought him into custody. Worthington was wearing a fanny pack containing jewelry and keys belonging to Ms. Griffin.

"At the police station, Worthington relayed his story of four days of drinking and getting high. After being presented with the evidence against him, Worthington confessed to the killing but could not remember the details since, he said, he was prone to blackouts when using alcohol and cocaine. At the time the offenses occurred, Worthington said he was extremely high on Prozac, cocaine, marijuana, and alcohol. He also said that two friends, Darick and Anthony, helped him with the burglary. However, this story was inconsistent with the physical evidence and with subsequent statements made by Worthington. Worthington pleaded guilty to the crimes charged. The judge imposed the death penalty for the murder conviction, as well as prison terms for the other offenses."

## II. STANDARDS FOR REVIEW OF DENIAL OF POST–CONVICTION RELIEF

This Court's review of the motion court's denial of post-conviction relief is limited to a determination of whether the findings of fact and conclusions of law are clearly erroneous. *Moss v. State*, 10 S.W.3d 508, 511 (Mo. banc 2000). A judgment is clearly erroneous when, in light of the entire record, "the court is left with the definite and firm impression that a mistake has been made." *Id.* The motion court's findings are presumed correct. *Black v. State*, 151 S.W.3d 49, 54 (Mo. banc 2004).

In order to be entitled to post-conviction relief, a movant is required to show by a preponderance of the evidence

that: 1) counsel failed to exercise the customary skill and diligence of a reasonably competent attorney under similar circumstances, and 2) counsel's deficient performance prejudiced him. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Deck v. State,* 68 S.W.3d 418, 425 (Mo. banc 2002).

Mr. Worthington bears a heavy burden in attempting to satisfy the first prong of the *Strickland* test, for he must overcome a strong presumption that counsel provided competent representation by showing "that counsel's representation fell below an objective standard of reasonableness." *Deck,* 68 S.W.3d at 425–426. *See also* Rule 29.15(i); *Middleton v. State,* 103 S.W.3d 726, 732 (Mo. banc 2003). This standard is met by identifying specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance. *Id.* at 425. It is presumed that counsel's conduct was reasonable and effective. *Clayton v. State,* 63 S.W.3d 201, 206 (Mo. banc 2001). "Reasonable choices of trial strategy, no matter how ill fated they appear in hindsight, cannot serve as a basis for a claim of ineffective assistance." *Cole v. State,* 152 S.W.3d 267, 270 (Mo. banc 2004); *Knese v. State,* 85 S.W.3d 628, 633 (Mo. banc 2002). It is also not ineffective to pursue one reasonable trial strategy to the exclusion of another reasonable trial strategy. *Clayton,* 63 S.W.3d at 207.

To satisfy the second prong of the *Strickland* test, a movant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Middleton,* 103 S.W.3d at 733. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "In order to show prejudice in a guilty plea case, a defendant must prove that, but for the errors of counsel,

he would not have pled guilty and would have demanded a trial." *State v. Roll,* 942 S.W.2d 370, 375 (Mo. banc 1997).

Because the penalty phase was tried to a judge, it is particularly difficult to meet this standard. In court-tried cases judges are given great latitude in the admission of evidence because of the presumption that they will not give weight to incompetent evidence. *Pike v. Pike,* 609 S.W.2d 397, 403 (Mo. banc 1980). "Because of this, it is difficult to base reversible error on the erroneous admission of evidence in a court-tried case." *Blackburn v. Richardson,* 849 S.W.2d 281, 291 (Mo. App. S.D.1993). Erroneous admission of such evidence constitutes harmless error if other properly admitted evidence supports the judgment. *Id.* Further, because "judges are presumed to not consider improper evidence at sentencing," *State v. Carter,* 955 S.W.2d 548, 560 (Mo. banc 1997), "this Court presumes that inadmissible evidence" relevant to sentencing "is neither prejudicial nor fundamentally unfair in court-tried matters." *Id.*

## III. GUILT PHASE ERROR—FAILURE TO INVESTIGATE

By pleading guilty, Mr. Worthington waived any claim that counsel was ineffective except to the extent that the conduct affected the voluntariness and knowledge with which the plea was made. *Roll,* 942 S.W.2d at 375. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052.

Mr. Worthington argues counsel acted unreasonably in not further investigating his social and medical history. In regard to the guilt phase, he alleges that

had an adequate investigation been done he would not have pled guilty but would have proceeded to trial using a diminished capacity defense. In support, at the post-conviction hearing, he presented the testimony of three experts, Dr. Jonathan Pincus, Dr. Dennis Cowan, and Dr. Robert Smith, who together testified that he had a variety of serious mental and physical disorders, including Tourette's syndrome, attention deficit hyperactivity, obsessive compulsive disorder, bipolar disorder, frontal lobe cerebral brain dysfunction, and post-traumatic stress disorder.[2]

The motion court was not required to believe these doctors' diagnoses, which were not otherwise supported by prior medical opinions and which were based on very limited experience with Mr. Worthington. Dr. Pincus' diagnosis was based on a single meeting more than four years after the murder and rape. Similarly, Dr. Smith examined Mr. Worthington over four years after the crime and the majority of the tests he administered related to substance abuse issues. Dr. Cowan also had just a single meeting with Mr. Worthington almost five years after the murder. Because of their limited familiarity with him, these experts necessarily largely based their conclusions on his own self-reporting of symptoms, history, and condition. While the motion court could have accepted their conclusions, it was not required to do so. It found that Mr. Worthington was not a reliable or credible witness due to his conflicting testimony throughout the proceedings, and this greatly undermined the reliability of these experts' diagnoses.

Furthermore, the fact that Mr. Worthington found experts who were willing to testify at the post-conviction stage that he had a variety of medical disorders does not mean that counsel were ineffective in failing to find similar experts before deciding that a diminished capacity defense would not be effective and recommending that Mr. Worthington plead guilty. While he argues that their decision not to pursue this defense resulted from lead defense counsel's refusal to provide necessary funds for investigation and his failure to seek such funds from the State as permitted by *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the record supports the motion court's contrary conclusions.

Defense counsel were seasoned capital-litigation attorneys, with extensive experience in criminal and death penalty litigation. Prior to the work done on this case, Mr. Green had been involved in 40 to 50 capital cases. He had received training from the state and had attended national seminars and symposiums on how to litigate a capital case. Mr. Rosenblum's area of practice was exclusively criminal defense. He had tried 150 or more jury trials, with over 50 being homicide cases and seven being capital cases. In a deposition taken for the post-conviction hearing, Mr. Rosenblum stated that he had initially considered and investigated the benefit of presenting a diminished capacity defense. To assist him in deciding whether to take that approach, he had hired a psychiatrist, Dr. Kevin Miller, who met with Mr. Worthington twice and reviewed his records. But, like the State's expert, Dr. Miller found that Mr. Worthington did not suffer from mental disease or defect at the time of the offense and that he could appreciate the nature, quality, and wrongfulness of his conduct. Mr. Rosenblum testified that he believed that in general, diminished capacity defenses do not go over well and are difficult to defend, that he believed that it would be an "uphill

---

**2.** His allegations that this failure affected the penalty phase trial are discussed *infra.*

battle" to present the defense with all the evidence of Mr. Worthington's drug and alcohol abuse, and that the portion of Dr. Miler's report that supported the defense was outweighed by the negative effect it might have. In particular, he feared Dr. Miller's report would corroborate Dr. Givon's anti-social personality and malingering diagnoses, and so he made a strategic decision not to pursue the diminished capacity defense.

▪ While defense counsel could have continued to consult additional experts in the hope of finding one who might support a diminished capacity defense, counsel is not required to seek out an expert who might provide more helpful testimony. *Taylor v. State*, 126 S.W.3d 755, 762 (Mo. banc 2004). Counsel is entitled to instead pursue other reasonable defense strategies. *Id.*

Further, there was no showing that lack of funds played an improper part in that decision. The evidence showed that a family friend hired Mr. Rosenblum for $50,000. Mr. Rosenblum in turn contracted for Mr. Green to look for mitigating evidence and to investigate social history for $10,000. While Mr. Green at one point said he asked Mr. Rosenblum to give him additional funds so he could conduct further investigation on issues regarding mitigation and DNA testing, it is not ineffective to consider cost in deciding what type of investigation to do and how to do it, so long as the resulting investigation is adequate. Mr. Worthington has failed to show that counsel did not adequately investigate using other means.

▪ Defense counsel did have sufficient funds to hire two experts on the issue of diminished capacity. One, Dr. Miller, as noted, ultimately did not testify when counsel decided not to pursue a diminished capacity defense, but he was available. A second expert, Dr. Evans, did testify on behalf of the defense in the penalty phase. In these circumstances, counsel cannot be found to have failed to sufficiently investigate a diminished capacity defense in the guilt phase. Rather, counsel instead made a strategic choice to advise Mr. Worthington to plead guilty and concentrate on his penalty phase defense. A reasonable strategy, even if it looks imperfect in hindsight, cannot provide the basis for an ineffective assistance of counsel claim. *Cole*, 152 S.W.3d at 270.

While Mr. Green initially stated that he also wanted money for a DNA expert, he said he then determined that it would not be necessary. Moreover, Mr. Worthington did not offer any evidence that, had a DNA expert been located, the expert would have been able to testify favorably to the defense. Absent a showing that further investigation would have provided such evidence, no prejudice could have resulted from the failure to further attempt to obtain a defense DNA expert. *See State v. Davis*, 814 S.W.2d 593, 603–604 (Mo. banc 1991) ("When a movant claims ineffective assistance of counsel for failure to locate and present expert witnesses, he must show that such experts existed at the time of trial, that they could have been located through reasonable investigation, and that the testimony of these witnesses would have benefited movant's defense").

In sum, it was not unreasonable for defense counsel to conclude that the risk of a death sentence was greater if Mr. Worthington went to trial than if he pled guilty and the penalty phase was tried to the judge. Mr. Worthington at the time agreed and made a knowing decision to plead guilty. Based on this evidence, the court did not err in concluding that it was reasonable to plead guilty rather than attempt a diminished capacity defense.

*IV. PENALTY PHASE ERRORS*

*A. Failure to Investigate Social History.*

■ Mr. Worthington also argues that his counsels' alleged failure to adequately investigate his social history made their penalty phase defense ineffective. He alleges that a more thorough investigation would have provided counsel with facts with which they could have countered inaccuracies in the testimony offered by the State's expert, Dr. Max Givon, in support of the latter's diagnosis of anti-social personality disorder. In particular, he alleges that Dr. Givon testified that he exhibited severe conduct disorder before he was age 15 based on the belief that he had intentionally burned his friend, Butch Mackey, over 90 percent of his body. At his post-conviction hearing, Mr. Worthington presented the testimony of Butch's father and stepmother, Mr. and Mrs. Mackey, who testified that it was Butch's brother, Richey, who was burned, not by defendant but by two other boys. They said that they would have so testified at trial, but no one had contacted them.

Even assuming the Mackeys' testimony was accurate—they made it clear that their knowledge of the incident was based on hearsay and counsel was unable to bring Butch or Richey to testify because they had their own problems with the law—the failure to investigate this collateral issue did not constitute ineffective assistance. Correcting the record as to who caused the burns was relevant only to the extent that the incident affected Dr. Givon's diagnosis of anti-social personality disorder and, in turn, to the extent that diagnosis affected the trial court's decision to impose the death penalty. Because extrinsic evidence cannot normally be used to impeach a non-party witness on a collateral issue, counsels' failure to undertake further investigation that might have revealed such extrinsic evidence was not prejudicial. *State v. Dunson,* 979 S.W.2d 237, 242 (Mo. App. W.D.1998); *Brewer v. Raynor Mfg. Co.,* 23 S.W.3d 915, 919 (Mo.App. S.D. 2000).

Even assuming that extrinsic evidence impeaching Dr. Givon's diagnosis would have been admissible had the burning incident been central to that diagnosis, there was no showing that this was the case. Defendant failed to call Dr. Givon at the post-conviction hearing or otherwise present evidence at that hearing that Dr. Givon relied on the burning incident in reaching his diagnosis. Dr. Givon's testimony at the trial indicates that the incident was not important to that diagnosis.

Dr. Givon testified that he principally based his diagnosis of anti-social personality disorder on Mr. Worthington's "pervasive pattern of disregard for and violation of the rights of others *occurring since age 15 years*" (emphasis added). He said this pattern included unlawfulness, deceit, impulsivity, irritability and aggression as indicated by fights and assaults, reckless disregard for safety, failure to sustain consistent work behavior, and lack of remorse.

Dr. Givon said that anti-social personality disorder also manifests itself as conduct disorder before age 15 and that Mr. Worthington showed such conduct disorder. But, he did not state that the burning incident was necessary to this conclusion. To the contrary, he stated that conduct disorder manifests itself as "aggression, fighting, crimes against property, stealing, behavior in school, fire setting, vandalism, things of that nature." He then listed dozens of examples of conduct disorder that Mr. Worthington told him about. They began at age six or seven and continued into his teen years, of which the incident in which Mr. Worthington's friend

was burned was only one, albeit remarkable, part:

He stated that he was suspended from school hundreds of times because of getting in trouble, being uncontrollable, too hyper. . . . He was involved in fights because people were messing with him. He had admitted setting his own home on fire twice as well as a garbage truck and he also said that he was always doing something destructive and made the remarkable statement that we burned our friend, Butch Mackey, over ninety percent of his body. I was eleven then. We were throwing gas on each other. He admitted to stealing and shoplifting when younger, beginning at age six or seven . . .

. . . .

. . . they were unable to control him in school. Therefore, he went to special behavior disorder school in Peoria. He said at age seven, eight, and nine he and his cousin broke into people's houses, stole alcohol and tomatoes. Age seven, eight, he burned a couple of houses . . . shot out windows with BB guns, . . . he was doing burglaries with his father, that's what he stated. He said he was very first arrested at age six or seven for shoplifting. . . .

As is evident, Dr. Givon was simply repeating what Mr. Worthington had told him, not vouching for its accuracy. Moreover, he did not state he particularly relied on the burning incident, nor that he believed that it showed intent to injure his friend. He simply reported that Mr. Worthington had told him that "we" burned our friend when "we" were throwing gas on each other. This description is more consistent with a reckless game than intentionally injuring another. Nothing suggests that, had the facts as to that incident been further explored, Dr. Givon's diagnosis would have changed. The failure to

further investigate the burning incident was not ineffective.

*B. Failure to Call Parents as Witnesses.*

██ Mr. Worthington claims that his counsel was ineffective in not presenting mitigation evidence by calling his parents at trial to testify to their abuse and neglect of him and in not showing that many of the juvenile crimes attributed to him were in fact committed by his parents, who thought they could get away with blaming him for the crimes because he was a juvenile.

██ To prevail on a claim of ineffective assistance of counsel for failure to call a witness, the following must be shown: "1) Trial counsel knew or should have known of the existence of the witness; 2) the witness could be located through reasonable investigation; 3) the witness would testify, and 4) the witness's testimony would have produced a viable defense." *Hutchison v. State*, 150 S.W.3d 292, 304 (Mo. banc 2004). Even then, "counsel's decision not to call a witness is presumptively a matter of trial strategy and will not support a claim of ineffective assistance of counsel unless the defendant clearly establishes otherwise." *Id.* As a matter of trial strategy, the determination to not call a witness is virtually unchallengeable. *State v. Jones*, 885 S.W.2d 57, 58 (Mo.App. W.D.1994). "If a potential witness's testimony would not unqualifiedly support a defendant, the failure to call such a witness does not constitute ineffective assistance." *Id.*

This case demonstrates the wisdom of these rules. For instance, Mr. Worthington asks this Court to find that his mother should have been called at trial and that counsel's failure to do so constituted ineffective assistance because she would have testified to her abuse of him and that she

had committed many of the crimes for which he was blamed. Yet, although she was present at the hearing, counsel chose not to call her as a witness to support this contention. The court below could well have found that the decision was made not to call her because her testimony would not have supported Mr. Worthington's assertions that she would have aided in his defense at trial.

Indeed, that is the intendment of the testimony offered at the post-conviction hearing by one of Mr. Worthington's trial counsel. He testified that he chose not to call Mr. Worthington's mother at the trial because he was afraid that her testimony would undermine the defense's mitigation theory that Mr. Worthington had a horrible childhood because his mother continually tried to portray herself as a good mother rather than as the abusive woman Mr. Worthington claimed she had been. He also believed that she was high on crack on the day she would have testified at trial. It was not unreasonable for counsel to make the strategic choice that it was better to use records of Mr. Worthington's history of abuse from Illinois than to call his mother at the trial.

Similarly, failure to call Mr. Worthington's father was not ineffective. Although counsel knew of the father's potential to be a witness, he was difficult to locate. Further, the evidence at the post-conviction hearing indicated that he had not had contact with his son since 1997 and they did not have much of a relationship.

In this situation, counsel decided that it made more sense to call Mr. Worthington's maternal aunt, Carol. She was able to testify to much of the same evidence that Mr. Worthington's parents would have offered. As noted, evidence of his abuse as a child also came in through records obtained from Illinois. Other evidence was also introduced concerning his childhood

and social history. Based on the evidence that was offered, the trial judge in fact found that Mr. Worthington was abused and neglected and was raised in a dysfunctional household. She nonetheless imposed the death penalty. The motion court did not err in holding that offering additional evidence of such abuse by calling Mr. Worthington's parents was not necessary nor was its absence prejudicial.

### C. Failure to Disqualify Judges Schneider and Nichols.

 *Judge Nichols.* Mr. Worthington alleges that counsel were ineffective because counsel did not check with him before waiving a potential conflict of interest on the part of Judge Nichols. The issue did not arise until Charlotte Peroti stated in the course of her testimony that her son was named Anthony Hansen. At that point, Judge Nichols informed counsel that when she heard that name she realized that she had been appointed guardian ad litem for Anthony some 10 to 12 years earlier, when he was about six years old and had received burns in a hot bath. She had not recognized Ms. Peroti until then. She asked whether either party had a concern about her continuing as judge in this circumstance. Counsel for Mr. Worthington specifically testified that he had no concern and waived any conflict. Mr. Worthington now says that his counsel was ineffective in waiving this potential conflict since Mr. Worthington had identified Anthony Hansen as a co-participant in the crime and his mother was a witness for the State.

 Trial counsel was not required to consult with his client before waiving the conflict. Defense counsel has wide discretion in determining what strategy to use in defending his or her client. "A client is bound by the decisions of counsel as to the management of the trial and as to

stipulations which give effect to that strategy." *State v. Hurt*, 931 S.W.2d 213, 214 (Mo.App. W.D.1996). The accused has the right to make certain fundamental decisions, such as whether to plead guilty, waive a jury, testify or appeal; other decisions are for the attorney alone, even without consultation with the client. *Id.* Waiving the disqualification of a judge is not one of these fundamental decisions that must be personally made by the accused. *See State v. Baller*, 949 S.W.2d 269, 274 (Mo.App. E.D.1997).

Neither was the decision not to seek disqualification unreasonable. At the postconviction hearing, Mr. Green testified that he and Mr. Rosenblum decided after consultation to waive the conflict as a matter of trial strategy. Mr. Green had conducted an extensive background investigation on Judge Nichols prior to advising Mr. Worthington to plead guilty. Mr. Green further testified that he spoke with other attorneys in the community about Judge Nichols, that he determined that she was fair and a person of integrity, and that he had not found any negative information about her. Counsel were not ineffective in failing to object to Judge Nichols remaining on the case despite her prior representation of Anthony in an unrelated matter.

 Perhaps aware of the discretion accorded defense counsel in a circumstance such as this, Mr. Worthington also alleges that Judge Nichols should have recused herself *sua sponte* when she became aware of her prior representation of Anthony because it created the appearance of impropriety.

 There is a presumption that a judge acts with honesty and integrity and will not preside over a trial in which he or she cannot be impartial. *Smulls v. State*, 10 S.W.3d 497, 499 (Mo. banc 2000). A judge should only be disqualified if a rea-

sonable person would find an appearance of impropriety and question the impartiality of the court. *Id.* Whether a fact requires recusal depends on the factual context, which:

> gives meaning to the kind of bias that requires disqualification of a judge. Specifically, a disqualifying bias or prejudice is one that has an extrajudicial source and results in an opinion on the merits on some basis other than what the judge learned from the judge's participation in a case. In cases requiring recusal, the common thread is either a fact from which prejudgment of some evidentiary issue in the case by the judge may be inferred or facts indicating the judge considered some evidence properly in the case for an illegitimate purpose.

*Id.* (internal quotation marks omitted).

Mr. Worthington has not met this standard here. This Court held on direct appeal that Mr. Worthington's claim that two friends, including Anthony Hansen, helped him with the burglary was inconsistent with the physical evidence and with later statements made by Mr. Worthington. There is also no evidence that Judge Nichols' representation gave her any extrajudicial source of information about the present case or caused her to prejudge any issue or to look favorably upon Ms. Peroti.

 Finally, Mr. Worthington alleges that counsel was ineffective for not moving to disqualify Judge Nichols on the basis that she was biased in favor of the death penalty because members of the public called upon her, through the press and in letters, to impose the death penalty and because her opponent in a judicial election stated that a judge's view on the death penalty is a legitimate election issue. But, he cites to no cases holding that public pressure requires a judge to recuse solely

on that basis. Such an argument must be rejected. Were it otherwise, persons could improperly force the recusal of an impartial judge merely by creating a public controversy about the judge. In the absence of evidence showing that the publicity and calls for the death penalty affected Judge Nichols' impartiality, the mere existence of publicity did not require her recusal.

The record further reveals that Judge Nichols took reasonable measures to limit any perceived public pressure to impose the death penalty by delaying sentencing until the day after the election, an election that she lost. Mr. Worthington asks this Court to speculate that she might have imposed the death penalty because she wanted favorable publicity in the event she decided to seek public office at some point in the future, but such speculation has no foundation in the record.

■ *Judge Schneider.* Judge Schneider won Judge Nichols' seat in the election and presided over the post-conviction motion hearing. Mr. Worthington argues that Judge Schneider's campaign comments on the death penalty created the appearance that she had prejudged his case and counsel should have demanded her recusal. But the prosecutor, not Judge Schneider, made many of the statements Mr. Worthington refers to, and in any event the prosecutor lost his bid for reelection.

The only statements attributed to Judge Schneider are that "the death penalty and life in prison is an issue all citizens are concerned about ... The judge can take the place of the jury, so it is important that public officials share their values and beliefs" and "it's very important for a judge to reflect the values of the community." These statements were about the death penalty in general, not Mr. Worthington. Judge Schneider had not been

elected at the time and, thus, was not even the judge assigned to his case. These statements do not indicate that Judge Schneider would rule based on improper motive or not fairly consider the claims made by Mr. Worthington in his post-conviction motion.

*D. Failure to Disclose Correct Name of Prosecution Witness.*

■ On direct appeal, Mr. Worthington argued that the State failed to give the defense notice of its intent to call Charlotte Peroti to testify to instances of uncharged misconduct, specifically that he burglarized her apartment, tried to sexually assault her, and stole her car. This Court found that the issue was not properly preserved, since counsel allowed this testimony to come in without objection, but reviewed for plain error. This Court also found that the danger of undue weight being given to uncharged misconduct was greatly reduced because the case was tried to a judge rather than to a jury, 8 S.W.3d at 91. *See also Carter,* 955 S.W.2d at 560.

On direct appeal, this Court concluded, "[a]s to Ms. Peroti's testimony, the state had endorsed her two years before the penalty phase. Defense counsel was prepared to cross-examine her on the details of her failure to report the burglary and assault to police. Absent objection, there is no basis under plain error analysis for concluding that the admission of the evidence was prejudicial to Worthington." 8 S.W.3d at 91.

Mr. Worthington now argues that counsel were ineffective in failing to object to the lack of adequate notice of Ms. Peroti's testimony and in failing to seek a continuance to investigate the basis of Ms. Peroti's allegations. Because the quoted passage in the Court's opinion used the term "plain error", but then said that the error caused no prejudice rather than merely

stating that it caused no manifest injustice, the State and Mr. Worthington disagree as to whether this Court's ruling on direct appeal precludes Mr. Worthington from now alleging these errors as a basis for post-conviction relief. *See Deck,* 68 S.W.3d at 427–428 (finding of no prejudice on appeal precludes finding of prejudice on post-conviction review, but in rare cases court may find an error that did not constitute manifest injustice nonetheless creates a reasonable probability that, but for the error, the result would have been different, entitling defendant to post-conviction relief).

This Court need not resolve that disagreement, for, assuming the issue may be raised as a basis for post-conviction relief, Mr. Worthington has not shown that there is a reasonable probability that the result of the penalty trial would have been different had counsel objected to the lack of notice of Ms. Peroti's testimony and sought a continuance.

As this Court noted on direct appeal, Ms. Peroti had been listed as a witness for two years under the name of Charlotte Kirn. Defendant endorsed her and all of the State's witnesses as his own. Even if counsel did not know until she got on the stand that Charlotte Peroti and Charlotte Kirn were the same person, Mr. Worthington had mentioned Ms. Peroti numerous times in his statement to police after his arrest and counsel knew all about the events to which she testified and cross-examined her effectively about them. While counsel was not aware of Ms. Peroti's bad check conviction, he did establish her bias against Mr. Worthington, her attempt to get him arrested for drug trafficking, her belief that he was corrupting her son, and her dislike of him. There is no reasonable probability that the minor additional impeachment value of showing that she had a prior bad check conviction

and that she may have exaggerated her role as a police informant affected the outcome of the case.

*E. Failure to Object to Other Evidence of Non–Statutory Aggravators.*

■■ Mr. Worthington argues that counsel were also ineffective in failing to object to other evidence of non-statutory aggravators, such as his bad behavior in school and in jail, prior uncharged misconduct with friends, burglaries undertaken with his father, and other similar evidence. On direct appeal, admission of this evidence was found not to be plain error because most of it was stipulated to by the defense.

Defense counsel testified at the post-conviction motion that he wanted the court to see some of the records Mr. Worthington now argues should have been objected to, because they were relevant to mitigation in that they showed the dysfunctional family in which Mr. Worthington grew up and were evidence of prior abuse. Furthermore, this was a court-tried case, and counsel testified that in deciding not to object he considered that the court would see the evidence anyway in ruling on the objections and much of the evidence would subsequently be before the court in the pre-sentence investigation and the court could consider it when making a decision on punishment. Thus, an objection, even if successful, would not have prevented the judge from being aware of the information.

■■ Ineffective assistance of counsel is rarely found in cases of a failure to object. *State v. Holloway,* 877 S.W.2d 692, 697 (Mo.App. E.D.1994). It will only be deemed ineffective when the defendant has suffered a substantial deprivation of his right to a fair trial. *Id.* "In addition, counsel is not ineffective for failing to make nonmeritorious objections." *Id.*

It was not unreasonable for counsel to conclude that it was better not to object and instead to use the positive aspects of the information to support the claim that Mr. Worthington should not receive death. Counsel cannot be ineffective for making reasonable choices of trial strategy, even if in hindsight another strategy might have been more favorable. *Cole,* 152 S.W.3d at 270.

Further, given the large amount of evidence of prior crimes that was admissible and the evidence of prior arrests and other bad acts that had to be put before the judge to make some of Mr. Worthington's arguments, there is no reasonable probability that any error in admitting some additional prior bad act evidence was so prejudicial that the result of the proceeding would have been different if that evidence had not been admitted.

Mr. Worthington also alleges that counsel should have objected to the victim impact evidence introduced by the State because it was so excessive as to be unduly inflammatory. This Court rejected a nearly identical claim on direct appeal. *Worthington,* 8 S.W.3d at 89. While this Court reviewed that claim under a plain error standard, it nonetheless determined that the State is allowed to do more than present a brief glimpse of the victim's life, *Id.* at 90, and held that the amount of victim impact evidence admitted was neither excessive nor unduly inflammatory merely because the witnesses were permitted to read prepared statements that indicated they wanted a message to be sent and that justice be served. Further, this Court conducted an independent review of the proportionality of the sentence and found it was not the result of passion, prejudice or other arbitrary factors. *Id.* at 89–91.

This Court reaffirms those conclusions here. It is clear that some victim impact evidence was admissible. *State v. Storey,* 40 S.W.3d 898, 909 (Mo. banc 2001) (victim impact evidence is admissible under the United States and Missouri constitutions and violates them only "if it is so unduly prejudicial that it renders the trial fundamentally unfair"). Assuming, without deciding, that an excessive amount of victim impact evidence was offered, this Court cannot say there is a reasonable probability that the result of the proceeding would have been different if a lesser amount of victim impact evidence had been admitted. *Deck,* 68 S.W.3d at 429. Much of the evidence was similar in nature. Any prejudicial effect was greatly limited by the fact that the case was tried to the court, rather than a jury, because judges are "presumed not to consider improper evidence when sentencing a defendant." *Roll,* 942 S.W.2d at 378.

## V. INABILITY OF STATE TO PERFORM CONSTITUTIONAL EXECUTIONS

Finally, Mr. Worthington argues that execution by lethal injection, and its related procedures, causes death by a process that involves lingering death, mutilation, and unnecessary and wanton infliction of pain in violation of the Eighth and Fourteenth Amendments to the United States Constitution. In support of his claim, he cites the case of Emmitt Foster, who was executed by the State in 1995. Mr. Worthington alleges that Foster's execution took 30 minutes to carry out and that Foster convulsed during the execution. Further, Mr. Worthington cites to nine other lethal injection executions from other states that involved similar incidents.

For the reasons set out in *Morrow v. State,* 21 S.W.3d 819, 828 (Mo. banc 2000), the argument that lethal injection is unconstitutional *per se* because if improperly performed it may result in unnecessary and wanton infliction of pain and so consti-

tute cruel and unusual punishment is rejected.[3]

## VI. CONCLUSION

For the reasons set out above, the judgment is affirmed.

All concur.

**3.** As it is unknown what method, if any, of lethal injection may be utilized by the State of Missouri at such future time, if any, as Mr. Worthington's right to seek relief in state and federal courts is concluded and his execution date and method are set, it is premature for this Court to consider whether a particular method of lethal injection violates the Eighth Amendment because it causes lingering, conscious infliction of unnecessary pain.