**Danny Bill STOTT, Movant–Appellant,**

v.

**STATE of Missouri, Respondent–
Respondent.**

**No. 26748.**

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 24, 2006.

James F. Speck, Kansas City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Alison K. Brown, Asst. Atty. Gen., Jefferson City, for Respondent.

PHILLIP R. GARRISON, Judge.

Danny Bill Stott ("Movant") appeals the denial, after an evidentiary hearing, of his post-conviction motion, filed pursuant to Rule 29.15.[1] He had been convicted by a jury of one count of statutory sodomy pursuant to Section 566.062 and two counts of

---

1. All references to rules are to Missouri Rules of Criminal Procedure (2004) and all references to statutes are to RSMo (2000), unless otherwise indicated.

child molestation pursuant to Section 566.067. He was sentenced to fifteen years on statutory sodomy and ten years on both child molestation counts, to run concurrently. Movant appealed the conviction and sentences which were affirmed by this court in a written order. *See State v. Stott,* No. 24083 (S.D. filed August 26, 2002). Movant filed his timely motion under Rule 29.15, which was later amended by appointed counsel. Following an evidentiary hearing, the motion court entered its findings of fact and conclusions of law denying Movant's motion from which he appeals. We affirm.

Viewed in the light most favorable to the verdict, the evidence at trial revealed the following. Between June 1, 1998, and June 3, 1999, victim ("A.H."), born August 11, 1992, who was then six years old, lived with her parents, Deeanna ("Deeanna") and Larry Hanger, and her three siblings (collectively referred to as the Hangers) in Springfield, Missouri. Movant, who lived across the street, became acquainted with the Hangers, and was especially friendly with A.H. Both A.H. and her brother ("Z.C.") would go over to Movant's house on occasion, with A.H. "sneaking" over to Movant's house eight to twelve times a week on her own. When A.H. would visit Movant at his house, he would give her candy, and she would sit on the couch and watch TV. While at Movant's house, he touched A.H. on her "front private" part and her "back private" part underneath her clothes with his hand while sitting on the couch with her.

Janice Crane ("Crane"), Movant's parole officer, visited Movant in his home during the time period of June 1, 1998, and June 3, 1999. She saw candy, toys such as dolls and stuffed animals, and games set on a love seat in Movant's living room. On May 21, 1999, at around 7:00 p.m., Crane was at Movant's home, when A.H. came to the front door and said, "Danny, let me in." Movant told her to "go away," but Crane asked A.H. if she came to Movant's house to play and she said, "Yes." A.H. told Crane that she came to play with Movant's toys and then told Crane her name and where she lived. Movant moved from that residence shortly after that visit.

On June 3, 1999, A.H. told Deeanna that "Danny had touched her pee-pee." Without asking A.H. any further questions, Deeanna called 911. Police Officer Zanetta Gann ("Officer Gann") talked with A.H. when she arrived at the Hanger residence. When Officer Gann asked A.H. what had happened, A.H. said, "He touched my private parts." When Officer Gann asked her how, A.H. told her that he had placed his hands inside of her underwear. A.H. also told Officer Gann that "he" played "sex movies" and that he had threatened to kill her. When Officer Gann asked A.H. who "he" was, A.H. pointed to the house across the street where Movant had lived and said, "Danny." Deeanna asked A.H. to show the officer how many times Movant had touched her and A.H. held up both hands with her fingers up. Officer Gann asked A.H. if she meant the number ten and she said, "Yes." A.H. told the officer that she was inside Movant's house when the touching occurred and that she and Movant were alone. She said that sometimes another girl, Cindy, was with her at Movant's house, but that Movant never touched her while Cindy was present.

A.H. was referred to the Child Advocacy Center ("CAC") where she met with Angela Bryant ("Bryant"), a child interviewer. A.H. told Bryant that during visits to Movant's home, he had touched her "pee-pee" with his hands, underneath her clothes, ten times. She also said that Movant would put his finger inside her "pee-pee" and that it hurt. A.H. told Bryant that Movant had touched her "pimples" (breasts)

with his fingers under her clothes and that also hurt. According to A.H., Movant had her watch "sex movies" with him that had adult people with their clothes off, kissing each other, which Movant kept in his "favorite" closet in his bedroom along with guns and knives. Movant told A.H. that if she told anybody he would kill her.

Vicki Ellison Burns ("Burns"), a family nurse practitioner with the CAC conducted the SAFE exam on A.H. The exam showed no physical findings in A.H.'s vagina or her rectum which was consistent with the type of sexual abuse that A.H. disclosed.

Subsequent to those events, Deeanna was walking down the hall in her house when she heard A.H., who was in her bedroom with Z.C., say, "[l]et's play the Danny massager game." Deeanna told her that she should not be doing that. A.H. explained to her that Movant had a "massager thing" that was big and round and it vibrated like a foot massager, and told Deeanna that Movant put the "massager thing" to her "butt." At the time A.H. was telling Deeanna about this she was upset. A.H. also told Deeanna that Movant told her if she said anything to anybody, he would kill her.

■ Appellate review of the motion court's denial of post-conviction relief is limited to a determination of whether the findings of fact and conclusions of law are clearly erroneous. Rule 29.15(k); *Worthington v. State*, 166 S.W.3d 566, 572 (Mo. banc 2005). "Findings of fact and conclusions of law are clearly erroneous if, after a review of the entire record, the court is left with the definite and firm impression that a mistake has been made." *Broussard v. State*, 110 S.W.3d 420, 422 (Mo. App. S.D.2003) (quoting *Moss v. State*, 10 S.W.3d 508, 511 (Mo. banc 2000)).

To be entitled to post-conviction relief, on grounds of ineffective assistance of counsel, Movant must show by a preponderance of the evidence that (1) counsel failed to exercise the customary skill and diligence of a reasonably competent attorney under similar circumstances, and (2) Movant was thereby prejudiced. *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984); *Worthington*, 166 S.W.3d at 572–73. "If either the performance or the prejudice prong of the test is not met, then we need not consider the other, and [ ] Movant's claim of ineffective assistance of counsel must fail." *Goudeau v. State*, 152 S.W.3d 411, 415 (Mo.App. S.D.2005).

Movant has a heavy burden in establishing ineffectiveness of counsel under the performance prong, because of the strong presumption that counsel provided competent representation. *Worthington*, 166 S.W.3d at 573. This presumption is overcome where Movant has demonstrated that "counsel's representation fell below an objective standard of reasonableness." *Wright v. State*, 125 S.W.3d 861, 866 (Mo. App. S.D.2003) (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052). Movant must "identify[ ] specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance." *Worthington* 166 S.W.3d at 573. Counsel's reasonable choice of trial strategy cannot serve as a basis for ineffective assistance of counsel, even if that strategy is pursued to the exclusion of another reasonable strategy. *Id.*

To satisfy the prejudice prong, Movant must show there is a reasonable probability that but for the counsel's ineffectiveness the outcome of the proceeding would have been different. *Goudeau*, 152 S.W.3d at 415. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

In his sole point on appeal, Movant contends that the motion court clearly erred in denying his Rule 29.15 motion for post-conviction relief in that his trial counsel was ineffective for failing to locate and present the testimony of an expert witness on proper techniques for interviewing children. He asserts that "[t]he expert testimony would have allowed [Movant] to effectively counter the primary obstacle in a child sexual abuse case: the unwillingness of jurors to believe that an innocent child would lie about being abused." In his amended Rule 29.15 motion, Movant alleged that:

> Counsel failed to conduct a reasonable investigation by failing to consult or procure the services of a qualified expert in child interviewing techniques for an opinion on the interviewing techniques employed by the interviewer at the [CAC], and the other hearsay witnesses in the interviews of [A.H.]. If he would have done so, counsel would have been able to present compelling testimony at the 491 hearing and at the trial demonstrating how the specific techniques employed by the interviewers encouraged [A.H.] to falsely testify that she was sexually abused by [M]ovant. Due to the inadequacy of his investigation, counsel lacked the information to make an informed decision whether to present such expert testimony.

Movant argues that "[b]y far the most damaging evidence was the videotape of the CAC interview," and "[i]f the jury had heard the testimony of [a qualified expert], there is a reasonable probability that the result of the trial would have been different."

In support of his claim that trial counsel was ineffective for failing to procure the services of an expert in child interviewing techniques, Movant presented the testimony of Dr. Robert Sanders ("Dr. Sanders"), a psychologist. Dr. Sanders testified that there is a generally accepted technique in interviewing alleged child victims known as the "Stepwise Interview Protocol." He stressed that when interviewing children, it is important to get the child into the mode of participating as an informant, by encouraging the child to give a free narrative with open-ended prompts. Referring to Bryant's interview of A.H., Dr. Sanders testified that Bryant kept the interview structured around performance demands, and she did not get A.H. into the frame of mind to converse about her experiences. He explained that if A.H.'s allegation of abuse would have occurred in the context of a free narrative, one could have more confidence in the truth of the report. After relating that he would have been available to testify at Movant's trial, Dr. Sanders explained that there is considerable research indicating that the accuracy of accounts is higher when using protocols, than when operating without them.

Movant also presented the testimony of Matthew O'Connor ("O'Connor"), an attorney experienced in defending child abuse cases. O'Connor explained that it was his customary practice to retain an expert in the field of child interviewing techniques when defending a child abuse case. He then related that there were experts available at the time of Movant's trial.

The State called its own expert in the field of child interviewing techniques, Kathy Bernet ("Bernet"). Bernet, formerly a child forensic interviewer with the CAC, explained that she had never used the stepwise approach in any of the 1,500 interviews that she had performed. She related that the interview technique employed by Bryant was a semi-structured approach she helped develop with Bryant and the CAC director. Bernet believed that the technique used did not taint the reliability of A.H.'s statement.

In its finding of facts and conclusions of law, the motion court found that "[e]ven if [Movant] could have afforded the services of Dr. Sanders or another similar expert ... that witness would not have provided a viable defense. At best, all such an expert could offer was limited impeachment of the interview technique that could be effectively countered by [ ] Bernet." The motion court then stated that "[m]ore importantly, trial counsel testified that the videotape was not key to his trial strategy. His defense did not focus on the child or the child's statements, but rather on the mother's role in producing those statements." The motion court found that this was not an unreasonable strategy.

To show ineffective assistance of counsel for failure to locate and present expert witnesses, Movant must prove (1) such experts existed at the time of trial, (2) they could have been located through reasonable investigation, and (3) the testimony would have benefited Movant's defense. *Cravens v. State,* 50 S.W.3d 290, 295 (Mo.App. S.D.2001). "The selection of witnesses is a question of trial strategy and is not a foundation for a finding of ineffective assistance of counsel." *State v. Fox,* 916 S.W.2d 356, 363 (Mo.App. E.D. 1996). However, where counsel lacks the information to make an informed judgment, because of inadequate investigation, any argument as to trial strategy is inappropriate. *Cravens,* 50 S.W.3d at 295.

In this case, with regard to the first of those factors, it is clear that Dr. Sanders was available to testify at the time of Movant's trial. O'Connor testified that other experts in the field of child interviewing techniques were also available at the time of trial. Concerning factor two, O'Connor explained that there were several resources available through which an attorney could find an expert in the field of child interviewing techniques. In fact, de-

fense counsel testified that he was aware of the existence of experts in this field, and had contacted the public defender's office who referred him to an expert in St. Louis.

Factor three, the factor the motion court found Movant failed to prove, was whether such an expert would have provided Movant with a viable defense. We agree with the motion court that Dr. Sanders or a similar expert would not have offered a viable defense because such an expert would have only provided limited impeachment of the interview technique. Furthermore, given the limited resources available to defense counsel, he pursued a reasonable trial strategy.

Had Dr. Sanders testified at Movant's trial regarding the techniques employed by Bryant, the jury would have had additional evidence before them relating to why A.H. would be fabricating her allegations. However, his testimony would have been effectively countered by Bernet, who explained that the protocol used by Bryant was based on several protocols accepted in the field, and was the protocol that she in fact had followed at the time. Furthermore, even if the jury were to accept the testimony of Dr. Sanders or a comparable expert, defense counsel was still faced with the task of explaining why A.H. initially made these allegations.

Defense counsel considered contacting an expert, but never did so, because of his understanding that Movant did not have the resources to pay for one. Movant's sister, his contact with the family regarding the case, had told him that they "absolutely had no money, period." In fact, defense counsel had to pay for a majority of the depositions taken in the case out of his own pocket. He explained that in his experience when clients had limited financial means he would adapt his trial strategy by preparing to cross-examine the

State's expert as opposed to employing his own expert.

In explaining his trial strategy, defense counsel related that, in addition to the videotaped interview, he believed A.H. would be able to testify at trial regarding the alleged sexual abuse, and so he chose to focus on why A.H. was bringing these allegations as opposed to attacking the videotape. While he still intended to cross-examine Bryant regarding the methods employed in the interview of A.H., defense counsel's strategy was to show that A.H. made these allegations because of pressure from Deeanna. Defense counsel's actions at trial were consistent with this strategy.

At trial, defense counsel called Movant's sister as a witness, who testified Deeanna had told her that Movant had never sexually touched A.H. He also called A.H.'s friend Alicia, who testified that A.H. had told her just before trial that Movant did not sexually abuse her, but that she would be "grounded for the rest of her life" if Movant did not go to jail. Alicia also revealed that Deeanna told her to say that Movant had touched her, which was untrue. Alicia's brother Marcus corroborated Alicia's account.

Finally, defense counsel called Lisa Pratt ("Pratt"), Marcus and Alicia's mother. Pratt testified that Deeanna would talk to her, in front of A.H., about Movant having abused A.H. She also recalled an incident when Alicia told her, after having been with Deeanna, that Movant had sexually abused her. Alicia later told her she had lied. After taking Alicia to counseling, Pratt became convinced Movant had not sexually abused Alicia.

In addition to presenting evidence that Deeanna encouraged A.H. to accuse Movant of sexually abusing her, defense counsel cross-examined Bryant regarding the interviewing techniques employed in the videotaped interviews with A.H. He elicited from Bryant that asking a child leading questions is dangerous. Bryant explained that because A.H. had trouble giving a free narrative she had to ask closed-ended questions.

In his closing argument, defense counsel noted that in the videotaped interview A.H. did not give a free narrative about the sexual abuse, but only provided answers to closed-ended questions. He also argued that it was Deeanna who coerced A.H. into alleging that Movant had sexually abused her.

Based on the evidence, we are unable to conclude that defense counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances by not locating and presenting testimony like that given by Dr. Sanders at the evidentiary hearing. *See Kluck v. State,* 30 S.W.3d 872, 877 (Mo.App. S.D. 2000). It was not defense counsel's strategy to discredit the methods used to interview A.H. through use of an expert witness. Instead, defense counsel attacked the veracity of A.H.'s statements by demonstrating that Deeanna had exhibited pressure on her to bring allegations of sexual abuse.

Additionally, Movant has not persuaded us that there was a reasonable probability that the result of his trial would have been different if counsel had procured such expert testimony. *See Cravens,* 50 S.W.3d at 295. In *Cravens,* we found that because counsel had failed to produce an expert witness, "the jury was left with but one inference to draw: Movant was guilty of knowingly killing the victim." 50 S.W.3d at 296. We were persuaded in *Cravens* that "had the expert testimony adduced at the evidentiary hearing been before the jury, it may have 'alter[ed] the entire evidentiary picture[.]' " *Id.* (quoting *Strickland,* 466 U.S. at 696, 104 S.Ct. 2052). In

the present case the jury was not left with but one inference to draw. Defense counsel presented evidence from which the jury could have drawn an inference that Deeanna pressured A.H. into fabricating allegations of abuse. Accordingly, had Dr. Sanders' testimony been before the jury, we do not find that the entire evidentiary picture would have been altered.

After reviewing the record, we are not left with the definite and firm impression that a mistake has been made. The record supports the motion court's finding that the testimony of an expert on child interviewing techniques would not have provided a viable defense. It also supports the trial court's finding that defense counsel's strategy, in light of the fact that he did not have the resources to hire an expert, was a reasonable one. This point is denied.

We affirm the denial of Movant's post-conviction motion.

SHRUM, P.J., and BARNEY, J., concur.