# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1802
No. 09-2000

_____

Michael Shane Worthington,

        Appellee/Cross-Appellant,

v.

Don Roper,

        Appellant/Cross-Appellee.

\* Appeal from the United States
\* District Court for the Eastern
\* District of Missouri.

_____

Submitted: September 23, 2010
Filed: January 6, 2011

_____

Before GRUENDER, ARNOLD, and SHEPHERD, Circuit Judges.

_____

GRUENDER, Circuit Judge.

The Circuit Court of St. Charles County, Missouri, sentenced Michael Worthington to death after he pled guilty to one count of first-degree murder, one count of first-degree burglary, and one count of forcible rape. Following unsuccessful state appeals and postconviction proceedings, Worthington filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, arguing seven grounds for relief. The district court granted his petition on one ground, from which Warden Don Roper now

appeals. Worthington, in turn, cross-appeals from the district court's rejection of two other grounds, for which the district court issued a certificate of appealability. For the reasons that follow, we reverse the district court's grant of Worthington's petition and affirm the district court's denial with respect to his two additional claims.

## I. BACKGROUND

In 1995, Worthington was charged with burglary, and the rape and murder of his neighbor, Melinda Griffin. The following facts are drawn from the Missouri Supreme Court's description of the incident in its opinion affirming Worthington's sentence. *See State v. Worthington*, 8 S.W.3d 83 (Mo. banc 1999). On the night of September 29, 1995, Worthington broke into Griffin's St. Charles County condominium. He used a razor blade to cut through the screen in the kitchen window and confronted Griffin in her bedroom. After strangling her into unconsciousness, Worthington raped Griffin with such force that he bruised the inside of her vagina, tore both labia minora, and made a deep tear between her vagina and anus. Griffin regained consciousness during the rape and attempted to fight Worthington, but he beat her and strangled her again, this time killing her. He then stole her jewelry, credit cards, mobile phone, keys, and car.

A neighbor discovered Griffin's remains on October 1. Her naked body was found at the foot of her bed, with a lace stocking draped across it. DNA testing later identified Worthington's semen on Griffin's body. When police officers located Worthington that evening, he was wearing a fanny pack containing Griffin's jewelry and keys. After he was arrested, Worthington initially told the investigating officers that he had been high and intoxicated from using alcohol and various other drugs for the previous four days. Upon being presented with the evidence against him, he confessed to killing Griffin but said that he could not remember the details of the incident.

The State charged Worthington with one count of first-degree murder, one count of first-degree burglary, and one count of forcible rape. He initially retained attorney Joel Eisenstein to represent him, but Eisenstein later withdrew. Worthington then retained attorneys N. Scott Rosenblum, Joseph L. Green, and Bradford Kessler,[1] all experienced capital defense attorneys. On August 28, 1998, Worthington pled guilty to all three charges without a plea agreement. He waived a jury for sentencing.

The four-day sentencing hearing commenced on September 14, 1998, at which time the State presented victim impact statements, forensic evidence, and evidence of Worthington's lengthy criminal history. A detective with the Peoria, Illinois Police Department testified that Worthington had been arrested fifteen times—often in connection with burglaries—and had been listed as a "suspect or criminal" in connection with another fifteen cases. At least three of the incidents involved Worthington breaking into his grandmother's house. In addition, the police records indicated that Worthington twice had assaulted his ailing grandfather, first by grabbing him and threatening his life and the second time by firing a gun at him. The State also presented evidence that Worthington repeatedly had been convicted for burglary as a juvenile and twice had been institutionalized in juvenile correctional facilities. He also was imprisoned twice by the Illinois Department of Corrections. Further, the State presented evidence that Worthington engaged in a pattern of disruptive and assaultive behavior while incarcerated after Griffin's murder, including fighting with inmates, threatening and attempting to assault correctional officers, and hiding contraband—including a razor blade—in his cell.

The State also called Dr. Max Givon, a psychologist. Dr. Givon had examined Worthington in 1996, pursuant to the defense's motion for a pretrial mental evaluation. *See* Mo. Rev. Stat. §§ 552.015-.030. In preparation for his report, Dr. Givon interviewed Worthington twice, administered an MMPI-2 psychological test,

_____

[1] Kessler withdrew from representation upon the dissolution of his partnership with Rosenblum.

and reviewed an extensive collection of records chronicling Worthington's background. He concluded that Worthington did not have a mental disease or defect, but instead that he had antisocial personality disorder, was malingering and cocaine-dependent, and abused alcohol.

In preparation for the penalty phase, attorney Green had two brief conversations with Worthington's mother and contacted Carol Tegard, Worthington's maternal aunt, who later would testify at the penalty hearing. Green did not obtain records other than those compiled during Dr. Givon's 1996 evaluation. Based on Dr. Givon's unfavorable conclusions regarding Worthington's mental health, Green did not consider further pursuing an expert psychological mitigation strategy at the penalty phase. Attorney Rosenblum, however, retained Dr. Kevin Miller, a psychiatrist, in early August 1998, initially for the purpose of exploring a diminished capacity defense at the guilt phase. He provided Dr. Miller with Dr. Givon's report, along with police investigative reports and partial records of Worthington's 10-day psychiatric hospitalization in 1994. Additionally, Rosenblum invited Dr. Miller to request further materials from Dr. Givon directly, and Dr. Miller met with Worthington twice. Dr. Miller's conclusions corroborated Dr. Givon's unfavorable diagnoses of antisocial personality disorder, cocaine dependance, and alcohol abuse. Dr. Miller also concluded that there was evidence that Worthington was suffering from attention-deficit/hyperactivity disorder, post-traumatic stress disorder, major depressive disorder (in remission), and that he had a history of cocaine-induced psychosis. However, Dr. Miller indicated that there was insufficient evidence to draw a definite conclusion on bipolar disorder, dissociative disorder, malingering, and complex partial seizures.

As a result of this second evaluation, Rosenblum decided against raising a psychological mitigation argument at the penalty phase. Instead, the defense team focused on Worthington's abusive background. Counsel presented the testimony of Carol Tegard, who recounted Worthington's abuse and neglect as a child. Counsel also presented numerous documents detailing Worthington's dysfunctional

background, including his mother's chronic alcoholism, his father's heroin addiction, and physical abuse and neglect by his family and babysitter. The presentence report ("PSR"), prepared by the Missouri Board of Probation and Parole for the sentencing court, confirmed these accounts and described incidents where Worthington was the victim of sexual abuse. In addition, counsel called three inmates and the records custodian from the St. Charles County Jail in an effort to undermine evidence pertaining to Worthington's misconduct while incarcerated. Finally, Dr. Roswald Evans, a psychiatric pharmacist, testified that Worthington was intoxicated at the time of the crime and that his intoxication "rendered him . . . incapable of making a decision about his behavior."

At the conclusion of the penalty phase, the sentencing court announced that it found as non-statutory mitigating circumstances that Worthington was raised in a dysfunctional family, was abused and neglected as a child, and was a long-term drug abuser. The court also found two statutory aggravating circumstances beyond a reasonable doubt: (1) that Worthington committed the murder while engaged in the perpetration of forcible rape and first-degree burglary, and (2) that Worthington committed the murder for the purpose of receiving money or things of monetary value from the victim. The court then sentenced Worthington to death on the murder count and sentenced him to terms of thirty years and life imprisonment for the burglary and the rape, respectively. The Missouri Supreme Court affirmed the sentence of death. *Worthington*, 8 S.W.3d at 94.

Worthington then filed a *pro se* motion for postconviction relief under Missouri Supreme Court Rule 24.035(j). The postconviction trial court subsequently appointed counsel, who filed an amended motion. Among other claims, Worthington asserted that trial counsel was constitutionally ineffective for failing to investigate his background adequately and to provide a complete social history to expert witnesses. Had experts further examined his background and his family's mental-health history, Worthington alleged, they would have been able to present testimony that he did indeed suffer from mental disease or defect. In support of his argument, Worthington

-5-

presented three expert witnesses—Drs. Jonathan Pincus, Dennis Cowan, and Robert Smith—who testified that Worthington suffered from a number of mental disorders, including Tourette's Syndrome, obsessive-compulsive disorder, attention-deficit/hyperactivity disorder, post-traumatic stress disorder, and bipolar disorder. Worthington also argued that trial counsel was constitutionally ineffective for failing to investigate and present additional mitigation evidence through his parents' testimony, and that counsel was constitutionally ineffective for failing to investigate and object to one of the State's penalty phase witnesses, Charlotte Peroti. The trial court denied Worthington's motion for postconviction relief, *Worthington v. State*, No. 00-12558 (Mo. Cir. Ct. St. Charles Cnty. filed Dec. 5, 2003), and the Missouri Supreme Court affirmed, *Worthington v. State*, 166 S.W.3d 566 (Mo. banc 2005).

In 2005, Worthington filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Missouri, pursuant to 28 U.S.C. § 2254. His petition sought review of seven claims, including the three discussed above. The district court held that the state courts had not adjudicated the merits of Worthington's claim that trial counsel had failed to adequately investigate and pursue psychological mitigation evidence. *Worthington v. Roper*, 619 F. Supp. 2d 661 (E.D. Mo. 2009). Applying *de novo* review, the district court granted habeas relief on that claim and ordered that Worthington either be sentenced to life in prison without the possibility of parole or be given a new penalty phase hearing. Although it denied relief on the remaining claims, the court granted a certificate of appealability with respect to (1) whether counsel was constitutionally deficient for failing to investigate and present additional mitigation evidence through the testimony of Worthington's parents, and (2) whether counsel was constitutionally deficient for failing to investigate and object to Charlotte Peroti's testimony. For the reasons discussed below, we affirm the district court's denial of Worthington's two ineffective-assistance claims, and we reverse its grant of relief on the ineffective-assistance claim relating to psychological mitigation evidence.

## II. DISCUSSION

## A. Warden Roper's Appeal

Warden Roper appeals the district court's ruling that Worthington's attorneys were ineffective during the penalty phase because they failed to investigate adequately his social history and medical history, including his family's background, and pursue a psychological mitigation strategy based on expert testimony. We review *de novo* the district court's legal conclusions, *Armstrong v. Kemna*, 365 F.3d 622, 626 (8th Cir. 2004), "including its application of the standards of review imposed by AEDPA," *Chadwick v. Janecka*, 312 F.3d 597, 605 n.6 (3d Cir. 2002). The district court's findings of fact are reviewed for clear error. *Armstrong*, 365 F.3d at 626.

Under 28 U.S.C. § 2254 as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a decision by a state court "with respect to any claim that was adjudicated on the merits in State court proceedings" is entitled to deference by the federal courts. "[W]hen a state prisoner files a petition for writ of habeas corpus in federal court we are directed to undertake only a limited and deferential review of underlying state court decisions." *Collier v. Norris*, 485 F.3d 415, 421 (8th Cir. 2007) (quoting *Morales v. Ault*, 476 F.3d 545, 549 (8th Cir. 2007)). AEDPA instructs that habeas relief cannot be granted "unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to" clearly established federal law if it either "arrives at a conclusion opposite that reached by [the Supreme] Court on a question of law" or "decides a case differently than th[e] [Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court "unreasonably applies" Supreme Court precedent if it "identifies the correct governing legal principle from th[e]

[Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "A federal court may not issue the writ simply because it 'concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Lyons v. Luebbers*, 403 F.3d 585, 592 (8th Cir. 2005) (quoting *Williams*, 529 U.S. at 411).

The language of § 2254(d) plainly limits the applicability of AEDPA's deferential standard to claims that have been "adjudicated on the merits" in state court. *Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) (en banc). Absent state court adjudication, a federal habeas court will apply *de novo* review. *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)). As a threshold matter, then, we must determine whether the Missouri courts adjudicated the merits of Worthington's claim that counsel was constitutionally ineffective for failing to investigate adequately his background and present effective psychological mitigation expert testimony at the penalty phase. Neither party argues that the Missouri Supreme Court adjudicated the claim's merits.[2] Rather, Warden Roper contends that the district court should have "looked through" the silent supreme court

---

[2] Because the issue was not contested, we will assume, without deciding, that the Missouri Supreme Court did not adjudicate the merits of the claim for purposes of AEDPA review. We observe, however, that the Missouri Supreme Court mentioned the claim at issue early in its opinion but never discussed it thereafter, 166 S.W.3d at 574 n.2, and that the court rejected Worthington's appeal in its entirety. It is well established in this circuit that a state court decision need not include reasoning as a prerequisite to applying AEDPA review, *see James v. Bowersox*, 187 F.3d 866, 869 (8th Cir. 1999); *see also Weaver v. Bowersox*, 438 F.3d 832, 838 (8th Cir. 2006) ("[A]lthough the [omitted] claims were not specifically discussed, the Missouri Supreme Court did address the claims in a conclusory fashion that is sufficient to bring the case under AEDPA."), and we note that *Harrington v. Richter*—currently pending before the Supreme Court—may shed further light on the contours of this issue, No. 09-587 (U.S. argued Oct. 12, 2010) (raising issue of whether AEDPA deference applies to a state court's summary disposition of a Sixth Amendment claim).

opinion and applied AEDPA's deferential review to the postconviction trial court decision. *See Ylst v. Nunnemaker*, 501 U.S. 797 (1991); *Mark v. Ault*, 498 F.3d 775 (8th Cir. 2007). This contention requires two related inquiries. First, did the postconviction trial court adjudicate the merits of Worthington's claim? Second, if the postconviction trial court did adjudicate the merits, should a federal habeas court "look through" the Missouri Supreme Court's decision and evaluate the postconviction trial court's reasoned decision under the deferential AEDPA standard?

As to the first inquiry, we conclude that Worthington's claim was indeed adjudicated on the merits by the postconviction trial court. That court correctly recognized *Strickland v. Washington*, 466 U.S. 668 (1984), as requiring proof that counsel's performance was objectively deficient and that the defendant was prejudiced thereby. *Worthington*, No. 00-12558, slip op. at 7-12. The court also determined that "[t]rial counsel's pre-trial conduct in having [Worthington] examined by two mental health professionals and consulting with and calling as a witness . . . a doctor of pharmacy, was a reasonable and thorough investigation." *Id.* at 10. Concluding that Worthington had failed to satisfy either *Strickland* prong, the court stated:

> [T]rial counsel did conduct a reasonable investigation and made a reasonable decision that made further investigations unnecessary. The court further finds that [Worthington] has failed to demonstrate that his trial counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would exercise under substantially similar circumstances and that he was thereby prejudiced.

*Id.* at 11. Despite the postconviction trial court's treatment of his ineffective-assistance claim, Worthington now argues that it did not adjudicate this portion of his claim because it did not adequately scrutinize his allegation that counsel performed ineffectively at the penalty phase by failing to supply experts with comprehensive background information. This argument fails to persuade, however, because a review of the postconviction trial court's decision leaves no question that it rejected

Worthington's ineffective-assistance claim *in toto*.[3]  "AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court."  *Weaver*, 438 F.3d at 839 (quoting *Muth v. Frank*, 412 F.3d 808, 815 (7th Cir. 2005)).  Accordingly, the postconviction trial court's discussion of counsel's performance— combined with its express determination that the ineffective-assistance claim as a whole lacked merit—plainly suffices as an adjudication on the merits under AEDPA.

As to the second inquiry, when a state appellate court affirms a lower court decision without reasoning, we "look through" the silent opinion and apply AEDPA review to the "last reasoned decision" of the state courts.  *See Winfield v. Roper*, 460 F.3d 1026, 1038 (8th Cir. 2006) (citing *Ylst*, 501 U.S. at 803-04); *cf. Mark*,  498 F.3d at 783 ("looking through" to Iowa Court of Appeals decision where Iowa Supreme Court denied discretionary review) (citing *Ylst*, 501 U.S. at 803-04).  This is so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims.  *See Winfield*, 460 F.3d at 1038 (citing *Steward v. Cain*, 259 F.3d 374, 377 (5th Cir. 2001)); *see also Bond v. Beard*, 539 F.3d 256, 289 (3d Cir. 2008) ("[W]e should review the [postconviction trial court] decision since it either represents the state courts' last reasoned opinion on this topic or has not been supplemented in a meaningful way by the higher state court.").  Worthington urges this court to limit the "look through" doctrine to its original application by the Supreme Court in *Ylst*—determining whether an independent state ground procedurally bars a petitioner from seeking federal habeas review.  However, Worthington's narrow reading is foreclosed by our decision in *Mark*, where we used

---

[3] In his primary ineffective-assistance claim presented to the postconviction trial court, Worthington intertwined allegations that counsel failed to investigate and present sufficient mitigation testimony through additional witnesses at the penalty phase with allegations that counsel failed to investigate and present sufficient background information to psychological experts in the context of both the guilt phase and the penalty phase. *See infra* n. 12.  We address Worthington's argument that counsel failed to call additional mitigation witnesses in Section II.B, *infra*.

-10-

the AEDPA standard to review the merits of an intermediate state court decision. 498 F.3d at 783 (citing *Ylst*, 501 U.S. at 803-04). Indeed, other courts likewise have employed AEDPA to review the merits of lower court decisions in the absence of a reasoned affirmance by a state's highest court. *See Malone v. Clarke*, 536 F.3d 54, 63 n.6 (1st Cir. 2008) ("The highest state court . . . summarily denied Malone's habeas claim, therefore, we 'look through' to 'the last reasoned decision,' which is the decision of the Massachusetts Appeals Court.") (citing *Gunter v. Maloney*, 291 F.3d 74, 80 (1st Cir. 2002)); *Bond*, 539 F.3d at 289 (reviewing the state trial court decision where the state supreme court decision "did not add further reasoning than that provided by the [postconviction trial court]"); *Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006) ("[T]he decision we review is that of the last state court to issue a reasoned opinion on the issue.") (quotation marks omitted); *Franklin v. Johnson*, 290 F.3d 1223, 1233 n.3 (9th Cir. 2002) (where state appellate courts denied habeas petition without comment, a federal habeas court "must look to the last reasoned decision of the state court as the basis of the state court's judgment").

Applying the deferential AEDPA standard of review to his claim that counsel performed ineffectively by failing to investigate and pursue mitigating psychological evidence, we now consider whether Worthington is entitled to federal habeas relief.[4] Because the postconviction trial court correctly identified *Strickland* as the controlling authority for ineffective-assistance claims, we address whether the state court unreasonably applied that precedent and whether the state court unreasonably determined the facts in light of the evidence presented. *Bucklew v. Luebbers*, 436 F.3d 1010, 1016 (8th Cir. 2006); 28 U.S.C. § 2254(d). As discussed above, to prove ineffective assistance of counsel, Worthington had to demonstrate both that counsel's performance was objectively deficient and that he was prejudiced by the deficient

---

[4] Because the parties have briefed Worthington's ineffective-assistance claim under the AEDPA standard, we need not remand the claim to the district court. *See Scarberry v. Iowa*, 430 F.3d 956, 958-59 (8th Cir. 2005).

performance. *See Strickland*, 466 U.S. at 687. Failure to establish either *Strickland* prong is fatal to an ineffective-assistance claim. *Id.* at 697.

The first prong of *Strickland* requires a showing that counsel's performance fell below an objective standard of reasonableness. *Id.* at 687-88. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. Although in assessing the reasonableness of counsel's performance the Supreme Court has looked to sources such as the ABA Capital Sentencing Guidelines, *see, e.g.*, *Rompilla*, 545 U.S. at 387; *Wiggins*, 539 U.S. at 524, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant," *Strickland*, 466 U.S. at 688-89. The Court also has emphasized that "hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made, and by giving a 'heavy measure of deference to counsel's judgment.'" *Rompilla*, 545 U.S. at 381 (quoting *Strickland*, 466 U.S. at 689, 691). As a result, review of the state court's determination that Worthington has not proved an ineffective-assistance claim is "twice deferential: we apply a highly deferential review to the state court decision; the state court, in turn, is highly deferential to the judgments of trial counsel." *Link v. Luebbers*, 469 F.3d 1197, 1202 (8th Cir. 2006) (quoting *Nooner v. Norris*, 402 F.3d 801, 808 (8th Cir. 2005)).

The second prong of *Strickland*—prejudice—requires a showing of a reasonable probability that, but for counsel's ineffectiveness, the result of the penalty phase would have been more favorable to the defense. *Strickland*, 466 U.S. at 691. Merely showing a conceivable effect is not enough; a reasonable probability is one "sufficient to undermine confidence in the outcome." *Wiggins*, 539 U.S. at 534 (quoting *Strickland*, 466 U.S. at 692).

Worthington relies heavily on three Supreme Court cases decided after *Strickland* that have further defined the contours of counsel's duty to investigate at the

penalty phase: *Williams v. Taylor*, *Wiggins v. Smith*, and *Rompilla v. Beard*.[5]  In *Williams*, the Court ordered habeas relief under AEDPA, concluding that counsel's performance fell well outside the bounds of effective assistance.  529 U.S. at 398-99.  Williams's counsel "did not begin to prepare for th[e] [penalty] phase . . . until a week before the trial," *id.* at 395, and failed to introduce any evidence of Williams's exemplary prison behavior, his role in helping to break up a prison drug ring, or his borderline mental retardation, *id.* at 396.  Furthermore, counsel also neglected to uncover extensive records describing Williams's "nightmarish" childhood, "not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." *Id.* at 395.

The Court in *Wiggins* likewise held that counsel's decision to limit the scope of investigation—and their resulting failure to introduce *any* of Wiggins's personal history as mitigation evidence—was constitutionally deficient.  539 U.S. at 523.  The state court decision to the contrary, the Court held, "reflected an unreasonable

---

[5] The Supreme Court also has addressed counsel's duty to investigate in two more recent cases, *Porter v. McCollum*, --- U.S. ---, 130 S. Ct. 447 (2009) (per curiam), and *Bobby v. Van Hook*, --- U.S. ---, 130 S. Ct. 13 (2009) (per curiam).  Under AEDPA's standard of review, however, our analysis is limited to "the law as it was 'clearly established' by [Supreme Court] precedents at the time of the state court's decision." *Wiggins*, 539 U.S. at 520.  In any event, *Porter* and *Van Hook* have not altered the scope of *Strickland*.  The Court in *Porter* concluded that defense counsel's representation had been constitutionally deficient where counsel had "failed to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service."  130 S. Ct. at 453.  In *Van Hook*, the Court examined petitioner's claim under the pre-AEDPA standard, 130 S. Ct. at 16, and denied relief where petitioner's trial counsel had communicated with his parents, aunt, and family friend; consulted with two expert witnesses; and contacted the Veterans Administration in an effort to obtain petitioner's medical records, *id.* at 18.  Rejecting petitioner's argument that trial counsel should have further investigated his background, the Court concluded that "given all the evidence they unearthed from those closest to Van Hook's upbringing and the experts who reviewed his history, it was not unreasonable for his counsel not to identify and interview every other living family member or every therapist who once treated his parents." *Id.* at 19.

application of *Strickland*." *Id.* at 528. Counsel had abandoned any form of mitigation argument based on personal history after having acquired only the presentence investigation report—which included a one-page account of Wiggins's background—and city social service records documenting his placements in the state foster care system. *Id.* at 523. The Court determined that counsel's failure to expand their search "after having acquired only rudimentary knowledge of [Wiggins's] history from a narrow set of sources" fell below an objective standard of reasonableness. *Id.* at 524 (citing ABA Guidelines). While "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing," *id.* at 533, the Court concluded that counsel nonetheless had been ineffective. "'[S]trategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'" *Id.* (quoting *Strickland*, 466 U.S. at 690-91).

Finally, in *Rompilla*, the petitioner argued that trial counsel had been constitutionally ineffective at the penalty phase for failing to investigate his school records, juvenile records, evidence of alcohol dependence, and—most significantly—the court file of his previous conviction. 545 U.S. at 382-83. With regard to the school and juvenile records and the alcoholism evidence, the Court acknowledged that "there is room for debate about trial counsel's obligation to follow at least some of those potential lines of enquiry." *Id.* at 383. "Reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Id.* (citing *Wiggins*, 539 U.S. at 525; *Burger v. Kemp*, 483 U.S. 776, 794 (1987); *Strickland*, 466 U.S. at 699). However, the Court determined that counsel had performed deficiently in failing to examine the easily accessible court file on Rompilla's prior conviction, *id.*, because they were fully aware of the prosecution's plan to introduce evidence of the conviction at sentencing, *id.* at 389-90. Entries in the file, the Court observed, "would have destroyed the benign conception of Rompilla's upbringing and mental capacity" that Rompilla's trial counsel and mental health experts had entertained. *Id.* at 391.

Here, Worthington argues that trial counsel was ineffective for failing to investigate adequately his background and pursue a psychological mitigation strategy based on expert testimony. Specifically, Worthington faults trial counsel's failure to interview family members and acquaintances, to procure his records from the Illinois Department of Corrections, and to obtain the psychiatric and medical records of Worthington's mother, father, uncle, grandmother, and grandfather. This additional history, he alleges, would have supported mitigating expert testimony regarding his mental health. The state court concluded that trial counsel made a reasonable decision not to pursue the mental-health strategy further and thus acted reasonably in not pursuing further psychological evidence. *Worthington*, No. 00-12558, slip op. at 10, 11.

As we have noted, "counsel has a duty to conduct a reasonable investigation or to make a reasonable determination that an investigation is unnecessary." *Link*, 469 F.3d at 1203 (citing *Sidebottom v. Delo*, 46 F.3d 744, 752 (8th Cir. 1995)). "Ordinarily, we consider strategic decisions to be virtually unchallengeable unless they are based on deficient investigation." *Id.* at 1204. Therefore, our analysis of Worthington's claim entails two inquiries: whether the state court reasonably decided that counsel had conducted an adequate investigation, and whether the state court reasonably decided that counsel's resulting decision to refrain from further investigating and presenting psychological mitigation evidence was reasonable.

Worthington's claim rests heavily on his contention that attorney Joseph Green performed an unreasonably cursory investigation before deciding against pursuing further psychological evidence. In particular, Worthington asserts, Green's testimony demonstrates that he had no strategic reason not to further investigate Worthington's background and pursue further psychological evaluations. Green had been "subcontracted" by attorney Scott Rosenblum to handle much of Worthington's penalty phase. During his post-conviction deposition, Green acknowledged that he had not hired a mitigation specialist even though mitigation specialists usually are employed in death penalty cases. He testified, though, that the records compiled by

Dr. Givon during his 1996 examination (discussed further below) "were consistent with the type of records that a mitigation specialist would have obtained." Green spoke to Worthington's mother only briefly, but he found that she was preoccupied with portraying herself as a good mother. He also contacted Carol Tegard, Worthington's aunt, who later testified as a mitigation witness during the penalty phase. Despite having the names of other family members and acquaintances, Green did not contact them or travel to Peoria, Illinois, Worthington's home town.[6] Green also did not procure records other than those acquired by Dr. Givon.

While the extent of Green's preparation for the penalty phase was not ideal, in assessing the reasonableness of counsel's performance, we cannot disregard the efforts of attorney Rosenblum. *See Bucklew*, 436 F.3d at 1019 ("It is not deficient performance for a team of attorneys to divide among them the workload of a case in a rational and efficient manner."). The record reflects that Rosenblum assumed the role of undermining Dr. Givon's testimony that Worthington was a malingerer and had only antisocial personality disorder, not a mental disease or defect. Although, based on the record, it is impossible to determine the level of Green's involvement in the relevant decision-making,[7] it is clear that Rosenblum investigated the possibility of a psychological mitigation argument at the penalty phase and made a reasoned strategic determination not to pursue such an approach. Rosenblum's testimony

---

[6] At his post-conviction deposition, Green testified that "a boatload of reasons" informed his decision not to travel to Peoria, including the fact that "time and expense was not a luxury I had, keeping up my own private practice and what I was getting paid . . . for on this case."

[7] Green testified that he was unaware that Rosenblum had retained Dr. Miller until well after the sentencing hearing. Green also indicated, though, that he was not responsible for the "logistics of hiring experts." Rosenblum testified, however, that "I know in my mind I discussed with Joe [Green] not only the fact I was talking to Dr. Miller but that I talked to him about his findings." The district court adopted Green's recollection without acknowledging Rosenblum's competing testimony. *See Worthington*, 619 F. Supp. 2d at 684 n.11.

establishes that he retained Dr. Miller, a psychiatrist, in early August 1998, initially for the purpose of exploring the feasibility of a diminished-capacity defense at trial. Dr. Miller met with Worthington twice, on August 6 and August 19. He also was provided with police investigative reports and partial records of Worthington's 10-day psychiatric hospitalization at the Methodist Medical Center of Illinois in 1994, along with Dr. Givon's 1996 report. Dr. Givon also had interviewed Worthington twice and had administered an MMPI-2 psychological test. As noted above, Dr. Givon's report diagnosed antisocial personality disorder, malingering, cocaine-dependence, and alcohol abuse. In addition, the report summarized a substantial collection of records regarding Worthington's background and medical history, including a school psychological evaluation performed at age fourteen; a 1989 psychological evaluation; records from the Illinois Department of Corrections, Youth Division; a 1994 report from White Oak Knolls Rehabilitation Center; records from Worthington's hospitalization at the Methodist Medical Center; and notes from two 1995 counseling sessions. Rosenblum did not provide Dr. Miller with every record on which Dr. Givon's report was based, but he invited Dr. Miller to request the materials from Dr. Givon directly. In his postconviction deposition, Rosenblum explained that he adopted a similar approach in previous cases because Dr. Givon "provide[d] his records generally pretty easily without much of a problem." Dr. Miller never requested further records from Rosenblum. Nor is there any indication that he contacted Dr. Givon.

This case is not one "where the record is clear that no reasonable attorney . . . would have failed to pursue further evidence." *Link*, 469 F.3d at 1203. Indeed, we have repeatedly observed that "[w]here counsel has obtained the assistance of a qualified expert on the issue of the defendant's sanity and nothing has happened that should have alerted counsel to any reason why the expert's advice was inadequate, counsel has no obligation to shop for a better opinion." *Marcrum v. Luebbers*, 509 F.3d 489, 511 (8th Cir. 2007) (citing *Sidebottom*, 46 F.3d at 753); *see also Winfield*, 460 F.3d at 1041. Cases in which the Supreme Court has held counsel's failure to investigate to be constitutionally ineffective involved a level of

-17-

deficiency absent from the present case. Counsel in *Williams* neglected to prepare for the penalty phase until one week before the hearing and erroneously believed that state law barred access to their client's records. 529 U.S. at 395. Counsel in *Wiggins* based their decision not to present any mitigating evidence solely on one page in a presentence investigation report and a collection of social service records that documented their client's placement history in the foster care system. 539 U.S. at 524-25. And counsel in *Rompilla* failed to examine a readily available court file that they knew the prosecution planned to introduce as evidence of aggravating factors. 545 U.S. at 389-90.

In light of Supreme Court precedent, then, we cannot say that the state court's determination that counsel conducted a reasonable investigation into psychological mitigating evidence constituted an unreasonable application of clearly established federal law. Counsel based the decision not to pursue a psychological mitigation strategy on the opinions of two mental-health professionals—Drs. Givon and Miller—each of whom had interviewed Worthington twice. Dr. Givon had reviewed a substantial collection of records pertaining to Worthington's social and medical history. Likewise, Dr. Miller demonstrated significant familiarity with many of the records documenting Worthington's background. *See* State App. 494 (noting Dr. Kessler's report); *id.* (noting Dr. Legan's report); *id.* (noting reports from the Illinois Department of Correction, Youth Division); *id.* 494-95 (noting records of Dr. Ryall's sessions). Further, Dr. Miller was aware of the physical and sexual abuse that Worthington suffered as a child. *See id.* 493. He also knew that Worthington's grandmother was chronically hospitalized for schizophrenia and that both of Worthington's parents had been in psychiatric hospitals and rehabilitation programs. *See id.* 496. We cannot conclude, therefore, that the opinions of Drs. Givon and Miller were so lacking in factual basis that the state court unreasonably concluded that counsel had conducted an adequate investigation.[8]

---

[8] We observe that the present case is plainly distinguishable from *Antwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995), where, conducting habeas review under the pre-

Having determined that counsel reasonably investigated the potential for a psychological mitigation strategy, we now examine the state court's decision that counsel reasonably decided against further investigating and presenting expert psychological evidence at the penalty phase. Because Worthington has failed to show that his attorneys' investigation was deficient, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see also Rompilla*, 545 U.S. at 390 ("Questioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there."). Rosenblum's testimony demonstrates that counsel's decisionmaking in this case fell well within the bounds of reasonable trial strategy. After "a rather lengthy [telephone] conversation" with Dr. Miller, Rosenblum decided against pursuing a psychological mitigation strategy. Dr. Miller corroborated Dr. Givon's diagnosis of antisocial personality disorder, which Rosenblum considered "very damaging." Additionally, Rosenblum expressed concern that "[s]ome of [Worthington's] self reporting . . . was not consistent under hypnosis." This inconsistency, he feared, would undermine efforts to challenge Dr. Givon's diagnosis of malingering, especially in light of Dr. Miller's inability to refute Dr. Givon's conclusion. The beneficial "nuggets" in Dr. Miller's diagnoses were far outweighed by the "substantial negative impact his testimony would have had." For these reasons, counsel decided not to present testimony regarding Worthington's mental health at the penalty phase. Instead counsel presented a meaningful mitigation case that focused on Worthington's abusive background and persuaded the sentencing court to find as mitigating factors his

AEDPA standard, this court held unreasonable an attorney's decision to limit investigation of petitioner's mental condition. There, counsel based its decision solely on the results of a cursory court-ordered mental examination. *Id.* at 1365. Although the psychiatrist's conclusions were facially inconsistent with available evidence, counsel did not seek any further examination, instead employing "an emotional beg-for-mercy approach" at the penalty phase hearing. *Id.* at 1367. Because "limiting the investigation was not reasonable," this court determined that "the subsequent strategic choice" was similarly unreasonable. *Id.*

dysfunctional family life, his abuse and neglect as a child, and his history of drug abuse. "Taking into account the leeway given to counsel under the *Strickland* standard and that given to the state courts under 28 U.S.C. § 2254(d)," *Marcrum*, 509 F.3d at 501, we conclude that Worthington has not overcome the strong presumption that counsel acted reasonably in deciding against pursuing an expert psychological mitigation strategy, *see Link*, 469 F.3d at 1204.[9] As a result, we reverse the district court's grant of habeas relief on this claim.

## B. Worthington's Cross-Appeal

Worthington first cross-appeals the district court's rejection of his argument that trial counsel performed ineffectively by failing to conduct an adequate investigation and present further mitigating evidence through additional witnesses. In particular, Worthington asserts that his parents—Patricia Washburn ("Patricia") and Richard Worthington ("Richard")—would have testified about his troubled upbringing. The Missouri Supreme Court held that counsel reasonably decided not to present Patricia's testimony because, when contacted, she had downplayed Worthington's traumatic childhood and endeavored "to portray herself as a good mother." *Worthington*, 166 S.W.3d at 578. The court also noted that counsel believed that Patricia was under the influence of cocaine on the day she would have testified at trial. *Id.* Therefore, the court concluded, "[i]t was not unreasonable for counsel to make the strategic choice that it was better to use records of Mr. Worthington's history of abuse from Illinois than to call his mother at the trial." *Id.* Turning to Worthington's father, the court determined that, even though counsel had not spoken with Richard, their decision not to present his testimony was also reasonable. According to the court, Worthington's father was "difficult to locate" and "did not

_____

[9] Because we hold that the state court's conclusion that Worthington failed to satisfy the first prong of *Strickland* was not an unreasonable application of clearly established federal law, we do not reach the second prong of the analysis—whether the psychological evidence propounded by Worthington post-conviction had a reasonable probability of altering the outcome.

have much of a relationship" with Worthington. *Id.* In any event, the court observed that Carol Tegard—Worthington's aunt—"was able to testify to much of the same evidence that Mr. Worthington's parents would have offered." *Id.* Moreover, the sentencing court reviewed numerous records detailing Worthington's abusive background. *Id.* For these reasons, the Missouri Supreme Court concluded, "offering additional evidence of . . . abuse by calling Mr. Worthington's parents was not necessary nor was its absence prejudicial." *Id.*

Applying AEDPA review,[10] the district court upheld the state court conclusion that counsel's decision not to call Patricia was reasonable under *Strickland*. *Worthington*, 619 F. Supp. 2d at 679. And while the district court disagreed with the Missouri Supreme Court's factual findings that Richard was difficult to locate and had only a sporadic relationship with his son, it nevertheless determined that "[i]t was not unreasonable for the Missouri Supreme Court to have concluded that Richard Worthington's testimony would have been cumulative, and petitioner was not prejudiced." *Id.*

With regard to his mother's testimony, Worthington challenges the Missouri Supreme Court's determination that counsel reasonably decided against calling Patricia as a witness. Worthington contends that the postconviction trial court did not make "an explicit factual finding" that "counsel had a tactical basis for not calling [Patricia] because her testimony might harm the defense." Thus, asserts Worthington, the Missouri Supreme Court's conclusion that counsel made a reasonable strategic decision was an unreasonable determination of the facts because it was "based upon a non-existent factual finding." *See* 18 U.S.C. § 2254(d)(2), (e)(1). As an initial matter, we note that the postconviction trial court did, in fact, find that counsel's decision not to call Patricia was a reasonable decision based on her cocaine habit and

---

[10] Unlike Warden Roper's appeal, the parties agree that the AEDPA standard of review governs the claims regarding Worthington's parents and Charlotte Peroti's testimony.

her statements downplaying Worthington's abusive childhood. *See Worthington*, No. 00-12558, slip op. at 11. Even had the Missouri Supreme Court based its decision on findings of fact independent from those of the postconviction trial court, however, we could not grant Worthington's habeas petition absent a showing that those findings were unreasonable. Section 2254(e)(1)'s "presumption of correctness applies to factual determinations made by state courts, whether the court be a trial court or an appellate court." *Perry v. Kemna*, 356 F.3d 880, 883 (8th Cir. 2004) (internal quotation marks omitted); *see also Sumner v. Mata*, 449 U.S. 539, 546-47 (1981). The Missouri Supreme Court based its decision on the same factual findings noted by the postconviction trial court, *see Worthington*, 166 S.W.2d at 578, and Worthington has made no showing that those findings do not enjoy the support of the record.

With regard to the testimony of his father, Worthington argues that the district court erred in upholding as reasonable the Missouri Supreme Court's decision that Worthington was not prejudiced by the absence of Richard's testimony. Had Richard testified, Worthington contends, the sentencing court would have gained a better understanding of Worthington's abusive background. We agree with the district court, however, that the Missouri Supreme Court reasonably concluded that Worthington suffered no prejudice, because Richard's testimony would have been cumulative of evidence already before the sentencing court. *Worthington*, 619 F. Supp. 2d at 679.

At the penalty phase, the sentencing court heard the testimony of Carol Tegard, who described Worthington's tormented childhood and youth. She testified about the widespread drug and alcohol abuse that surrounded Worthington during his early years, as well as his mother's prostitution. Worthington and Patricia were "constantly moving," at one point living out of a car until Patricia sold it for drug money. Tegard also testified that Patricia attempted suicide numerous times in Worthington's presence. Richard was a drug user and dealer who had minimal contact with the family until Worthington's adolescent years. When he did reenter Worthington's life, Tegard testified, Richard taught his son how to burglarize. According to Tegard,

Worthington underwent psychiatric treatment and checked into a drug rehabilitation program, but his family members refused to be supportive.

In addition to Tegard's testimony, numerous records before the sentencing court described the severe neglect and abuse that Worthington suffered as a child. For example, a 1989 psychological evaluation report described Worthington as having grown up "in a dysfunctional chaotic family made up of his chronic alcoholic mother and a heroin addicted father." The report also noted "chronic neglect and emotional, physical, and sexual abuse over the years." Records from the Methodist Medical Center of Illinois and the White Oaks Rehabilitation Center further described Worthington's chaotic upbringing, including his parents' drug addiction and physical abuse inflicted by a babysitter. Finally, the PSR provided numerous examples of Worthington's dysfunctional childhood, as well as detailing instances of physical and sexual abuse.

Worthington discounts the value of the evidence before the sentencing court for two reasons, neither of which is persuasive. First, he argues that Richard's testimony is not cumulative because the evidence before the sentencing court was "generic" and "skeletal." As described above, though, the state court's decision to the contrary is supported by the record. Tegard's testimony, the documentary evidence, and the PSR supplied a graphic and comprehensive account of Worthington's background. This stands in stark contrast to the evidence in the cases on which Worthington relies. *See Outten v. Kearney*, 464 F.3d 401, 421 (3d Cir. 2006) (observing that trial counsel failed to present any evidence of defendant's sexual abuse, possible neurological damage, or learning disabilities); *Ainsworth v. Woodford*, 268 F.3d 868, 874 (9th Cir. 2001) (determining that counsel adduced no substantive evidence in mitigation); *Lewis v. Johnson*, 2000 WL 1568168, at *4 (5th Cir. Sept. 13, 2000) (noting that single mitigation witness testified little more than that defendant "had a generally unhappy childhood"), *vacated in part*, 2000 WL 35549205 (5th Cir. Dec. 21, 2000); *Collier v. Turpin*, 177 F.3d 1184, 1201 (11th Cir. 1999) (observing that counsel

elicited only that defendant was a "hard worker" and had a reputation for truthfulness).

Second, Worthington dismisses the records before the sentencing court because "there is no evidence that the . . . court thoroughly reviewed any of these records before issuing its sentencing verdict." The penalty phase record belies Worthington's assertion, however. The sentence issued by the court was expressly "[b]ased on the evidence presented to this Court." *Cf. Strickland*, 466 U.S. at 695 ("[T]he assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision."). Indeed, based on the mitigating evidence before it, the sentencing court found as non-statutory mitigating circumstances that Worthington had a dysfunctional family, was abused and neglected as a child, and was a long-term drug abuser. Thus, Worthington's assertion that the sentencing court failed to review the record is meritless.

In light of Tegard's testimony, the extensive documentary evidence, and the PSR, we agree with the district court that the Missouri Supreme Court's decision that Worthington suffered no prejudice in the absence of his father's testimony did not unreasonably apply clearly established federal law. Nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The additional testimony "did not cover any new subject matter and was not substantially more persuasive" than that actually presented, *Eley v. Bagley*, 604 F.3d 958, 969 (6th Cir. 2010), and "would barely have altered the sentencing profile presented" during the penalty phase, *Strickland*, 466 U.S. at 700. Ultimately, much of what Worthington now claims should have been presented during the penalty phase was, in fact, considered by sentencing court. Thus, because the Missouri Supreme Court reasonably concluded that counsel's decision not to present

the testimony of Worthington's parents was not constitutionally ineffective,[11] we affirm the denial of habeas relief on that claim.[12]

Worthington also cross-appeals the district court's denial of his claim that trial counsel was constitutionally deficient for failing to investigate the background of State witness Charlotte Peroti and object to her testimony on the grounds that the State

---

[11] On appeal, Worthington also refers to unspecified "additional evidence of [his] childhood and social history." Although it is unclear whether Worthington is referring to evidence beyond that of his parents, the district court interpreted the claim to include "other family members and possibly former babysitters." *Worthington*, 619 F. Supp. 2d at 678. Assuming, without deciding, that Worthington properly raised this argument before both the district court and this court, we agree with the district court that, even under *de novo* review, counsel's failure to present testimony of his extended family members and childhood babysitters did not prejudice Worthington because such testimony also would be cumulative.

[12] Worthington also argues that the district court erred by "artificially truncating" his ineffective-assistance claim into two separate issues: whether counsel was constitutionally ineffective for failing to pursue expert psychological testimony, and whether counsel was constitutionally ineffective for failing to present additional lay witness mitigation testimony. According to Worthington, in assessing prejudice the district court should have balanced the aggravating evidence against the mitigating evidence presented at the sentencing phase as well as the entire mitigating evidence adduced post-conviction. To be sure, "it is necessary to consider *all* the relevant evidence that the [factfinder] would have had before it if [counsel] had pursued the different path." *Wong v. Belmontes*, --- U.S.---, 130 S. Ct. 383, 386 (2009). But because we earlier held that Worthington's ineffective-assistance claim regarding investigating and presenting psychological expert mitigation testimony did not amount to constitutionally deficient representation, *supra* Section II.A, his "cumulative error argument" is without merit, *Becker v. Luebbers*, 578 F.3d 907, 914 n.5 (8th Cir. 2009), *cert. denied*, 561 U.S. ---, 130 S. Ct. 3520 (2010); *see also Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996). Worthington's argument also fails because cumulative testimony, by its very nature, adds nothing to the evidence considered by the sentencing court. Consequently, the duplicative testimony of Worthington's parents would not have impacted the balance of mitigating and aggravating evidence under any circumstances.

had failed to disclose her correct name and the substance of her testimony. Peroti testified at the penalty phase that Worthington had broken into her house shortly before he murdered Griffin and that he had attempted to sexually assault her. In addition, Peroti testified that Worthington stole her car.

Although the State had endorsed Peroti as a witness more than two years before the commencement of the penalty phase hearing, the State had not given the defense notice of the subject matter of her testimony. As a result, on direct appeal the Missouri Supreme Court determined that the State's failure to notify the defense violated *State v. Debler*, 856 S.W.2d 641 (Mo. banc 1993), which held that evidence of uncharged misconduct is admissible during the penalty phase only if the State provides advance notice to the defendant. *Id.* at 657; *see also Worthington*, 8 S.W.3d at 90. However, because counsel had not objected to Peroti's testimony, the Missouri Supreme Court applied plain error review and denied relief, determining that "manifest injustice" had not resulted from the error. 8 S.W.3d at 90. Worthington had not been prejudiced by the *Debler* violation, the court maintained, because the dangers against which *Debler* sought to guard were absent in Worthington's case. *Id.* at 90-91. In crafting its notice requirement, the court in *Debler* highlighted the risk that "the average juror" would fail to differentiate between evidence of prior convictions and "significantly less reliable" evidence of uncharged criminal activity. 856 S.W.2d at 657. In the present case, the fact that a judge—rather than a jury—had determined Worthington's sentence obviated the danger identified in *Debler* that an "average juror" would give undue weight to Peroti's testimony regarding the uncharged sexual assault, burglary, and theft. *Worthington*, 8 S.W.3d at 90-91 & n.5. The Missouri Supreme Court also found that, despite the *Debler* violation, "[d]efense counsel was prepared to cross-examine [Peroti] on the details of her failure to report the burglary and assault to police." *Id.* at 91.

The Missouri Supreme Court likewise denied relief at the post-conviction stage, holding that Worthington had not been prejudiced by counsel's failure to object to Peroti's testimony and seek a continuance to investigate her allegations. *Worthington*,

166 S.W.3d at 580. The court found that "counsel knew all about the events to which [Peroti] testified and cross-examined her effectively about them." *Id.* at 581. Worthington also pointed to evidence that Peroti had been convicted of passing bad checks and that she had exaggerated her role as a police informant, arguing that had trial counsel known of this evidence they could have impeached her more effectively. The court acknowledged that counsel had been unaware of these facts but determined that they nevertheless had forcefully challenged Peroti's allegations by eliciting her strong antipathy towards Worthington. Thus, the court concluded, "[t]here is no reasonable probability that the minor additional impeachment value of showing that she had a prior bad check conviction and that she may have exaggerated her role as a police informant affected the outcome of the case." *Id.*

Reviewing the Missouri Supreme Court decision under AEDPA, the district court found the state court's conclusion that counsel "knew all about" Peroti's allegations to be an unreasonable determination of the facts. *Worthington*, 619 F. Supp. 2d at 692-93. However, the district court concluded that the state court's decision was not based on this mistaken factual determination. Because counsel effectively impeached Peroti's testimony and established her bias during cross-examination, the state court found that Worthington suffered no prejudice. *Id.* at 695 ("There is no reasonable probability that had the sentencing judge stricken her testimony or allowed counsel additional time to investigate the alleged prior bad acts, the outcome of the case would have been affected.").

Worthington urges us to reverse the district court for two reasons. First, he contends that the Missouri Supreme Court based its decision on an unreasonable determination of the facts, which led to its conclusion that he suffered no prejudice from counsel's failure to object to the lack of adequate notice of Peroti's testimony and to seek a continuance to investigate her background. Specifically, Worthington challenges the state court's factual finding that defense counsel had effectively cross-examined Peroti. *See* 18 U.S.C. § 2254(d)(2). "[A] state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in state court

proceedings' only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record." *Jones v. Luebbers*, 359 F.3d 1005, 1011 (8th Cir. 2004) (citation omitted); 28 U.S.C. § 2254(e)(1) ("[A petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). Like the district court, we hold that the state court's determination is reasonable and supported by the record.

Worthington argues that had counsel sufficiently prepared to examine Peroti, they would have been able to impeach her with evidence regarding her bad check conviction and the fact that she allegedly had exaggerated her work as an undercover drug informant. However, the state court found that counsel effectively cross-examined Peroti without pursuing those avenues for impeachment, and we cannot say that its finding is unreasonable under AEDPA. Even without prior knowledge of the substance of Peroti's testimony, counsel succeeded in establishing her bias against Worthington. On cross-examination, Peroti acknowledged that she had volunteered to work with the police "to try to get Michael Worthington arrested for drugs." Moreover, counsel elicited that Peroti wanted to "make sure [Worthington] got out of [her] area" because he had supplied her son and other children with drugs and alcohol. Peroti also admitted that she had never reported the alleged sexual assault to the police and that she had continued to interact with Worthington after the assault. Likewise, the PSR before the sentencing court detailed a police report that documented the incident only as "Burglary 1st and Stealing Over $150," further calling into question Peroti's testimony regarding the alleged sexual assault. Accordingly, we hold that there is sufficient record evidence to support the state court finding that counsel effectively cross-examined Peroti and that the court's determination of fact is thus not unreasonable in light of the evidence before it. We may not, therefore, upset the state court's determination that Worthington suffered no prejudice as a result of counsel's failure to investigate Peroti's background.

Second, Worthington proffers an alternative ground for overturning the Missouri Supreme Court's decision that he was not prejudiced by counsel's failure to

object to Peroti's testimony under *Debler*. Had counsel objected, Worthington contends, Peroti's testimony likely would have been excluded in its entirety, thus giving rise to a reasonable probability that the sentencing court would not have imposed the death penalty. As an initial matter, the Missouri Supreme Court has consistently maintained that *Debler*'s notice requirement only "slightly circumscribe[s]" the "wide latitude" that both the State and the defense enjoy at the penalty phase "to introduce any evidence regarding the defendant's character that assists the jury in determining the appropriate punishment." *State v. Smith*, 32 S.W.3d 532, 554 (Mo. banc. 2000) (citation omitted); *see also State v. Thompson*, 985 S.W.2d 779, 792 (Mo. banc 1999); *State v. Clay*, 975 S.W.2d 121, 132 (Mo. banc. 1998). Against this default principle that "the decision-maker is entitled to any evidence that assists in" the penalty determination, *Debler*, 856 S.W.2d at 656, we think it likely that, especially in the absence of a jury, the sentencing court would have simply granted a brief continuance to allow counsel to investigate Peroti, rather than exclude her testimony entirely. *See State v. Parker*, 886 S.W.2d 908, 917 (Mo. banc 1994) (observing, in the context of the State's alleged failure to timely disclose evidence under Missouri Supreme Court Rule 25.03, that "the proper remedy was continuance"); *State v. Brass*, 781 S.W.2d 565, 566 (Mo. Ct. App. 1989) ("Once surprise has occurred, the proper remedy is to request a continuance or postponement."). Moreover, because we earlier upheld the state court's determination that further investigation of Peroti's allegations would not have altered the result of the penalty phase, we reiterate that counsel's failure to secure a continuance did not prejudice Worthington.

Nevertheless, even considering the unlikely possibility that the trial court would have ordered the wholesale exclusion of Peroti's testimony, we agree with the district court that there was no reasonable probability that the sentencing court would have imposed a sentence of life imprisonment. *See Wiggins*, 539 U.S. at 534. Despite Worthington's assertion to the contrary, Peroti's testimony does not appear to be "the most damaging aggravating evidence" presented at the penalty phase. As we discussed above, Missouri courts have repeatedly acknowledged that evidence of

-29-

uncharged criminal misconduct is potentially unreliable. *Debler*, 856 S.W.2d at 657 ("Because no jury or judge has previously determined a defendant's guilt for uncharged criminal activity, such evidence is significantly less reliable than evidence related to prior convictions."); *Smith*, 32 S.W.3d at 554; *Thompson*, 985 S.W.2d at 792; *see also Strickland*, 466 U.S. at 695 ("[T]he assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision."). Indeed, the sentencing court made no mention of the alleged sexual assault when it issued the penalty. Rather the court pointed to only two statutory aggravating factors, neither of which implicated Peroti's testimony. The sentencing court subsequently filed a "Report of the Trial Judge" listing three nonstatutory aggravating circumstances, none of which included Peroti's allegations of uncharged sexual assault, burglary, and theft. Accordingly, the strictures of AEDPA review do not permit us to disturb the state court decision that Worthington suffered no prejudice as a result of counsel's failure to object to the lack of adequate notice of Peroti's testimony.[13] We affirm the denial of habeas relief on this ground.

---

[13] Worthington also raises a perfunctory argument that, had the sentencing court improperly admitted Peroti's testimony over a timely *Debler* objection, there is a reasonable likelihood that his sentence would have been overturned on direct appeal. Because this theory was not raised before the district court—or even the state courts—we decline to address it. *Whitmore v. Avery*, 26 F.3d 1426, 1429 (8th Cir. 1994), *vacated on other grounds*, 513 U.S. 1141 (1995); *see also Cummings v. Norton*, 393 F.3d 1186, 1190 (10th Cir. 2005) ("In order to preserve the integrity of the appellate structure, we should not be considered a 'second-shot' forum, a forum where secondary, back-up theories may be mounted for the first time.") (quoting *Tele-Comm'ns, Inc. v. Comm'r*, 104 F.3d 1229, 1232-33 (10th Cir. 1997)). In any event, this theory of prejudice is meritless because "it is difficult to base reversible error on the erroneous admission of evidence in a court-tried case." *Worthington*, 166 S.W.3d at 573 (quoting *Blackburn v. Richardson*, 849 S.W.2d 281, 291 (Mo. Ct. App. 1993)).

## III. CONCLUSION

For the foregoing reasons, we reverse the district court's grant of Worthington's petition for writ of habeas corpus, and we affirm its judgment denying habeas relief on the two grounds for which Worthington was granted a certificate of appealability. On remand, we instruct the district court to enter an order denying Worthington's petition.

_____