

# In the Missouri Court of Appeals
# Eastern District

## DIVISION THREE

| | | |
|---|---|---|
| PAUL E. JINKERSON, JR., | ) | No. ED110518 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of St. Francois County |
| v. | ) | Cause No. 21SF-CC00005 |
| | ) | |
| STATE OF MISSOURI, | ) | Honorable Wendy Wexler Horn |
| | ) | |
| Respondent. | ) | Filed: May 2, 2023 |

### Introduction

A trial jury found Appellant Paul Jinkerson Jr. guilty of involuntary manslaughter, armed criminal action, tampering with evidence, and abandonment of a corpse, and he was sentenced to a total of 59 years in prison. Jinkerson appeals the motion court's judgment denying his amended Rule 29.15 motion for post-conviction relief following an evidentiary hearing.[1] He argues the motion court clearly erred in denying his amended motion because trial counsel was ineffective for offering a jury instruction on the lesser included offense of involuntary manslaughter. We affirm the judgment of the motion court.

---

[1] All Rule references are to the Missouri Supreme Court Rules (2018), unless otherwise indicated.

**Background**

Jinkerson was charged as a persistent offender by amended information in lieu of indictment with first-degree murder in Count I, armed criminal action in Count II, tampering with physical evidence in Count III, and abandonment of a corpse in Count IV, all in connection with the shooting death of Frank Ancona (Victim) on or about February 9, 2017. The evidence at trial was as follows.

Victim was reported missing on February 9, 2017. Police officers responded to Victim's home, where they encountered Jinkerson and his mother, Malissa Ancona (Ancona), returning to the residence. Ancona told the officers that she and Victim, her husband, had been experiencing marital troubles and she had not seen him since 6 A.M. the previous morning, February 8, 2017. At the request of the officers, Ancona agreed to file a missing person report, in which she stated she had last seen Victim at 9 A.M. the previous day.

Jinkerson initially avoided speaking to the officers. Though he eventually answered some questions, he did not permit the officers to look in his car.

Officers returned to Victim and Ancona's house the next night, February 10, 2017, and Ancona consented to a search of the house. The house appeared to have been broken into, and Ancona reported that a safe in Victim's office was broken open. The officers did not search the bedroom that night.

The next day, February 11, 2017, Victim's car was discovered parked off a logging road in the woods in Washington County, Missouri. A receipt for prescriptions in Victim's name and a receipt from Walmart, both dated February 8, 2017, were recovered from the car. Surveillance video from Walmart showed Victim and Ancona shopping together at around 2 P.M. on February 8, 2017. A gas station receipt dated February 9, 2017 at 2:10 A.M. also was recovered

2

from the car. Near the car was a small burn pile containing clothing remnants, and next to the burn pile was a brown belt.

Later that day, Victim's body was discovered covered with logs along a dirt trail near the Big River in Washington County. An autopsy revealed that victim had been shot twice in the head, once with a handgun and once with a shotgun.

Police officers searched Jinkerson's home later that night. They seized a gas can and several items of clothing, including an AC/DC shirt, which were later determined to have Victim's blood on them. A picture posted to Jinkerson's Facebook account by Ancona on February 8, 2017 at 9:47 P.M. showed Jinkerson wearing the same AC/DC shirt and a brown belt identical to the one found near the burn pile. Officers also seized Jinkerson's car, the backseat area of which was later determined to be stained with Victim's blood.

During the search, officers questioned Jinkerson about his whereabouts. Jinkerson stated he stayed the night at the home of Victim and Ancona on February 8, 2017, but later claimed he left early in the morning on February 9. The officers seized Jinkerson's cell phone.

On the morning of February 11, 2017, officers searched the area around the house of Victim and Ancona. They found blood along the front sidewalk where cars would be parked. The officers obtained a search warrant for the house and discovered blood on the bed, walls, floor, ceiling, and door of the master bedroom.

Ancona agreed to talk to a detective during the search. During the recorded interview, Ancona claimed that Jinkerson shot Victim with a handgun while she was at a gas station. When she returned, there was another man present with a rifle who told her that he also shot Victim. Jinkerson told her that he and the other man broke into Victim's safe to steal Victim's medication and that he was trying to protect Ancona from Victim. Jinkerson threatened to kill

her if she told anyone. Ancona denied hurting Victim and stated she had no idea that Jinkerson was planning to kill Victim.

Ancona agreed to another recorded interview later that evening. In the interview, Ancona repeated that Jinkerson killed Victim to get his prescription drugs and to protect Ancona. Ancona also consented to a search of her phone.

Officers conducted a third recorded interview of Ancona the next evening, February 12, 2017. This time, Ancona admitted she was present when Jinkerson shot Victim and he acted pursuant to her direction. She claimed that Victim was physically abusive and had recently threatened to file for divorce and throw her out of the house. She and Jinkerson talked earlier that night about killing Victim, and Ancona told Jinkerson where to find Victim's guns. Ancona stated that Jinkerson used both a handgun and a shotgun to shoot Victim in order to make sure he was dead.

Ancona continued that, after Jinkerson shot Victim, he broke into the safe to steal Victim's prescription medicine. Jinkerson then wrapped Victim's body in a tarp and placed it in his car. Ancona followed Jinkerson out of town in Victim's car and they abandoned Victim's car in the woods. Jinkerson threw the handgun into the nearby river and later threw the shotgun into a lake. When they returned to the house, Ancona and Jinkerson attempted to clean up the blood in the master bedroom.

Searches of Jinkerson's and Ancona's phones revealed text messages between them on February 11, 2017 at 9:38 A.M., including the following conversation:

ANCONA: OK. But should we say he was attacking me… That's why u did it

ANCONA: Or that I went for a snack and when I came u already did it

JINKERSON: No we can't change the story now

ANCONA: If ur caught with that stuff tho.. Why did u do it

ANCONA: I'm still an accomplished [*sic*] there [*sic*] gonna wanna know why I didn't say anything

JINKERSON: Why did I do what

ANCONA: Nevermind

ANCONA: I hope I can trust u not to say anything

ANCONA: There [*sic*] gonna try and trick u to say something

JINKERSON: After all of this you hope you can trust me

ANCONA: I'm scared Paul … They already tried to lie to me about u … I love u I just want to make sure. I'm sorry I questioned u

JINKERSON: I heard they denied a search warrant for your house due to lack of evidence. That's good.

JINKERSON: The only thing left are those bags and I will get them Monday and it will all be done

Detectives interviewed Jinkerson on February 27, 2017. Jinkerson denied he was at Victim's house at the time of the murder. He stated he left the house early that morning to go to McDonald's and did not hear anything strange while he was sleeping. Jinkerson said he thought Ancona killed Victim, or she had someone do it for her.

Surveillance video from the McDonald's did not show Jinkerson present at any time on the morning of February 9.

Jinkerson called Ancona as a witness at trial. Ancona's trial testimony differed substantially from her prior statements. She testified that she was the one who shot Victim out of fear that he would divorce her and throw her out of the house. Jinkerson was at the house at the time of the murder, but was asleep on the couch during the entire event. What initially started as an argument with Victim escalated until Ancona retrieved Victim's handgun from his office and

5

fired a shot at Victim while he was lying in bed. The handgun jammed, so Ancona picked up the loaded shotgun, and fired another shot at Victim. Ancona provided inconsistent and incorrect explanations of how to operate the guns, including the location of the safety, the pump action of the shotgun, and the look and sound of the guns.

Ancona testified that she woke Jinkerson up only after she shot Victim twice and needed Jinkerson's help getting rid of the body. Jinkerson wrapped the body in a tarp and transferred it to the back of his car. The two then abandoned Victim's car in the woods, burned their bloodstained clothing, and disposed of Victim's body near the river. Ancona threw the handgun into the river, and Jinkerson later disposed of the shotgun in a lake. Ancona testified that she, not Jinkerson, broke into Victim's safe to steal his prescription medications.

When asked about her inconsistent story, specifically that she previously identified Jinkerson as the killer, Ancona responded that she lied to the police because she was scared and was "just thinking about [herself]."

Jinkerson also testified in his own defense at trial. He maintained that he did not kill Victim, but admitted helping Ancona dispose of the body. He claimed he woke up to the sound of the first gunshot and discovered that Ancona had killed Victim. He felt like he had no choice but to help Ancona and admitted rolling up the body in a tarp and transferring it to his car. Jinkerson also admitted helping Ancona dispose of Victim's car and body in the woods and burning their clothes.

Jinkerson's counsel took the position at trial that Ancona, not Jinkerson, murdered Victim, and Jinkerson knew nothing of her plan. During closing arguments, trial counsel asked the jury for complete acquittals on Counts I and II, first-degree murder and armed criminal action. The State offered, and the trial court submitted, jury instructions on first-degree murder

6

as charged in Count I, as well as the lesser included offense of second-degree murder. Trial counsel offered, and the trial court submitted, jury instructions on the lesser included offenses of voluntary manslaughter and involuntary manslaughter.

The jury found Jinkerson guilty of involuntary manslaughter on Count I. They also found Jinkerson guilty as charged of armed criminal action on Count II, tampering with physical evidence on Count III, and abandonment of a corpse on Count IV. The trial court sentenced Jinkerson to consecutive terms of 15 years, 30 years, 7 years, and 7 years in prison on Counts I, II, III, and IV, respectively, for a total of 59 years.

Jinkerson appealed his convictions on May 15, 2019, and this Court affirmed the judgment in *State v. Jinkerson*, 609 S.W.3d 525 (Mo. App. E.D. 2020). Jinkerson then timely filed his *pro se* Rule 29.15 motion for post-conviction relief on January 13, 2021. Post-conviction counsel was appointed and, on May 13, 2021, timely filed an amended Rule 29.15 motion.

The motion court held an evidentiary hearing on October 22, 2021, at which Jinkerson and trial counsel testified. The motion court issued its Findings of Fact and Conclusions of Law denying Jinkerson's amended Rule 29.15 motion on March 25, 2022. This appeal follows.

**Standard of Review**

Appellate review of a judgment denying a Rule 29.15 motion for post-conviction relief is limited to whether the motion court's findings of fact and conclusions of law are clearly erroneous. Rule 29.15(k); *Moore v. State*, 458 S.W.3d 822, 829 (Mo. banc 2015). A movant has the burden to show by a preponderance of the evidence that the motion court clearly erred. *Roberts v. State,* 276 S.W.3d 833, 835 (Mo. banc 2009).

7

**Discussion**

Jinkerson's sole point on appeal is that the motion court clearly erred in denying his amended Rule 29.15 motion because trial counsel was ineffective for offering the jury instruction on involuntary manslaughter, a lesser included offense of first-degree murder as charged in Count I. Specifically, Jinkerson argues the instruction was unreasonable given the "all or nothing" defense trial counsel pursued. Jinkerson maintains that, had trial counsel not offered the lesser included offense instruction, he would have been acquitted outright on Count I and the associated armed criminal action charge in Count II.

To succeed on a claim of ineffective assistance of counsel, a movant must show by a preponderance of the evidence facts, not mere conclusions, demonstrating: (1) counsel failed to conform to the degree of skill, care, and diligence of a reasonably competent attorney under similar circumstances, and (2) counsel's deficient performance prejudiced the movant. *McLaughlin v. State*, 378 S.W.3d 328, 337 (Mo. banc 2012); *Strickland v. Washington*, 466 U.S. 668, 687 (1984). If a movant fails to satisfy either element of the test, he is not entitled to relief. *Creighton v. State*, 520 S.W.3d 416, 422 (Mo. banc 2017).

"To satisfy the *Strickland* performance prong, a movant must overcome the strong presumption that counsel's conduct was reasonable and effective." *Tisius v. State*, 519 S.W.3d 413, 420 (Mo. banc 2017) (*quoting Hoeber v. State*, 488 S.W.3d 648, 655 (Mo. banc 2016)). "Defense counsel has wide discretion in determining what strategy to use in defending his or her client." *Worthington v. State,* 166 S.W.3d 566, 578 (Mo. banc 2005). "Reasonable choices of trial strategy, no matter how ill fated they appear in hindsight, cannot serve as a basis for a claim of ineffective assistance." *Id.* at 573 (*quoting Cole v. State,* 152 S.W.3d 267, 270 (Mo. banc 2004)).

Jinkerson's argument that trial counsel acted unreasonably in offering the involuntary manslaughter instruction relies exclusively on the assertion that no evidence at trial proved that Jinkerson recklessly caused the death of Victim, the culpable mental state for involuntary manslaughter. *See* Section 565.024.1 ("A person commits the offense of involuntary manslaughter in the first degree if he or she recklessly causes the death of another person.").[2] As a preliminary matter, whether there was sufficient evidence to convict Jinkerson of involuntary manslaughter was a subject of his direct appeal. *See Jinkerson*, 609 S.W.3d 525. We will not revisit a point already determined on direct appeal. *See Moss v. State*, 540 S.W.3d 427, 434 (Mo. App. E.D. 2018) (holding once a point has already been determined on direct appeal, it cannot be raised again in a post-conviction relief motion).

As a substantive matter, Jinkerson fails to recognize that evidence tending to prove the mental state for murder is also proof of the reckless mental state for involuntary manslaughter. *See State v. Ramirez*, 479 S.W.3d 640, 645 (Mo. App. W.D. 2015). A person commits first-degree murder if he or she knowingly causes the death of another person after deliberation upon the matter. Section 565.020.1. A person commits second-degree murder if he or she knowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person. Section 565.021.1(1).

According to Section 565.029, involuntary manslaughter is a "lesser degree offense" of first- and second-degree murder. Section 565.029 also cross-references and generally applies Section 556.046 to the consideration of "lesser offenses" in homicide cases. Section 556.046 provides that a person may be convicted of an offense "included in an offense charged" when either: (1) the included offense is established by proof of the same or less than all the facts

---

[2] All Section references are to the Revised Statutes of Missouri (2016), as supplemented, unless otherwise indicated.

required to establish the commission of the offense charged, or (2) it is specifically denominated by statute as a "lesser degree" of the offense charged. Section 556.046.1(1), (2). Though either scenario is sufficient, both apply here.

We address the second, simpler scenario first. As already mentioned, involuntary manslaughter is specifically denominated by Section 565.029 as a "lesser degree offense" of murder. More specific to the *mens rea* elements of those crimes, Missouri has statutorily "graded" culpable mental states so that, if a higher mental state is established, the lower mental state also is established. *Ramirez*, 479 S.W.3d at 645 (citing Section 562.021.4). As pertinent here, "Section 562.021.4 provides that, '[w]hen recklessness suffices to establish a culpable mental state, it is also established if a person acts purposely or knowingly.'" *State v. Randle*, 465 S.W.3d 477, 479 (Mo. banc 2015) (quoting Section 562.021.4)).

Regarding the first scenario in Section 556.046, here the "included offense" of involuntary manslaughter was established by proof of the same or less than all the facts required to establish the commission of the charged murder. Involuntary manslaughter is a "nested" lesser included offense of first- and second-degree murder. That is, it is distinguished from those greater offenses by one differential element, the culpable mental state, for which the state bears the burden of proof. *See Randle*, 465 S.W.3d at 479 ("Lesser-included offenses that are separated from the greater offense by one differential element for which the state bears the burden of proof are referred to as 'nested' lesser-included offenses."). Nested lesser included offenses are comprised of a subset of the elements of the charged offense, and therefore the charged offense cannot possibly be committed without necessarily committing the lesser included offense. *State v. Jackson*, 433 S.W.3d 390, 404 (Mo. banc 2014).

10

For all of these reasons, the State was not required to adduce additional evidence that Jinkerson recklessly caused Victim's death. The evidence that Jinkerson committed murder by knowingly causing Victim's death was also a basis for the jury to convict Jinkerson of involuntary manslaughter for recklessly causing Victim's death. *See Randle,* 465 S.W.3d at 479-80.

Jinkerson's trial counsel explained his reasoning along these lines at the evidentiary hearing. Counsel testified that, while he pursued an "all or nothing" defense that Ancona, not Jinkerson, was the killer, he also offered instructions on lesser included offenses, including involuntary manslaughter, as a "safety valve" in case the jury disagreed with the defense's argument. Counsel explained that, "if they were going to find him guilty, I did not want him to be found guilty of murder second with a life sentence at 85 percent, so I had submitted those as lesser includeds to give them options." Counsel testified that, in light of Ancona's multiple prior statements and the physical evidence implicating Jinkerson, instructing the jury on only first- and second-degree murder would have made him "nervous." Counsel even acknowledged he may have been found ineffective for failing to offer the instructions.

Jinkerson has failed to overcome the strong presumption that trial counsel pursued a reasonable trial strategy. To say the least, trial counsel's offering the lesser included offense instruction to avoid a murder conviction did not amount to deficient performance. *See Campbell v. State*, 598 S.W.3d 611 (Mo. App. S.D. 2020) (holding defense counsel not ineffective for requesting instructions on lesser included offenses because request was reasonable trial strategy). In fact, we need not engage in hindsight to assess the effectiveness of that strategy: the jury convicted Jinkerson of involuntary manslaughter, not first-degree murder as charged, a result not possible without the submission of the involuntary manslaughter instruction.

For similar reasons, Jinkerson also fails to demonstrate prejudice from trial counsel's request for the involuntary manslaughter instruction. He offers no support for his conclusion that the jury would have acquitted him outright but for submission of that instruction. Given the overwhelming evidence that Jinkerson, himself or acting with Ancona, knowingly caused the death of Victim, did so after deliberation on the matter, and was guilty of first-degree murder, he cannot demonstrate prejudice from his conviction for involuntary manslaughter. *See Walker v. State*, 34 S.W.3d 297, 303 (Mo. App. S.D. 2000) ("The relative strength or weakness of the state's case is significant in deciding if any deficiencies in trial counsel's performance were prejudicial.").

The motion court did not clearly err in denying Jinkerson's amended Rule 29.15 motion.

### Conclusion

We affirm the judgment of the motion court.

_____
Cristian M. Stevens, J.

Gary M. Gaertner, Jr., P.J., and
John P. Torbitzky, J., concur.